**MACK BORING AND PARTS, a New Jersey Corporation; Diesel Engine Service & Supply Co.; Engine City Technical Institute; Edward J. McGovern, as Administrator, Appellants,**

v.

**MEEKER SHARKEY MOFFITT, ACTUARIAL CONSULTANTS OF NEW JERSEY; Thomas Sharkey; Provident Mutual Life Insurance Company of Philadelphia, Appellees.**

No. 90–5663.

United States Court of Appeals, Third Circuit.

Argued Feb. 22, 1991.

Decided April 5, 1991.

Kenneth J. Hanko (argued), Morris Plains, N.J., for appellants Mack Boring and Parts, a New Jersey Corp., Diesel Engine Service & Supply Co., Engine City Technical Institute, Edward J. McGovern, as Adm'r.

Paul R. Williams, Jr., Westfield, N.J., for appellees Meeker Sharkey Moffitt, Actuarial Consultants of New Jersey.

Charles A. Reid, III (argued), Shanley & Fisher, Morristown, N.J., for appellee Provident Mut. Life Ins. Co. of Philadelphia.

Dona S. Kahn, Anderson, Kill, Olick & Oshinsky, Philadelphia, Pa., for amicus curiae The Unisys Pension Inv. Review Committee.

William F. Hanrahan, Groom & Nordberg, Washington, D.C., for amicus curiae American Council of Life Ins.

Before GREENBERG and COWEN, Circuit Judges, BUCKWALTER, District Judge.[*]

## OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal follows from an order of the district court dismissing an action commenced by Mack Boring and Parts Company ("Mack"). Mack had alleged that Provident Mutual Life Insurance Company of Philadelphia ("Provident") breached fiduciary duties imposed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461 (1985 & Supp.1990), with respect to its control over Mack's employee benefits plan. The district court held that Provident was not an ERISA fiduciary by virtue of ERISA's guaranteed benefit policy exception. 29 U.S.C. § 1101(b)(2). We agree, and will therefore affirm.

### I.

Mack and related corporations have maintained and sponsored a defined benefits plan for its employees since 1959 ("the Plan").[1] To facilitate its sponsorship, Mack entered into a standard Deposit Authorization contract ("DA contract") with Provident in 1972. DA contracts between pension plan sponsors and insurance companies first became popular in the late 1940s. Under a DA contract, the employer or other plan sponsor makes payments, usually in the form of premiums, to the insurance company issuing the contract. Those payments are placed in the insurance company's general account, which includes all the assets and liabilities of its insurance and ancillary operations, except those assets and liabilities specifically allocated to separate accounts. From its general account, the insurance company pays operating expenses (i.e. salaries, rent, taxes), obligations to general account contractholders,[2] obligations to creditors, and dividends to contract and policy holders. General account assets are often invested by the insurance company in private placement loans, corporate bonds, mortgages, real estate, and many other investment vehicles.

Any premiums held in the general account pursuant to a DA contract are not segregated from the other assets of the insurer, but are credited to an unallocated fund often called an "accumulation fund."[3] This fund, which serves in effect as a bookkeeping device, is periodically credited with interest at a rate either fully or partially guaranteed by the contract.[4] Because the typical DA contract provides for a certain degree of participation by the contractholder in the investment, mortality or expense experience of the insurer, the amount of interest credited to the accumulation fund may actually be higher than the minimum set forth in the contract.

---

[*] Honorable Ronald L. Buckwalter, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. A defined benefits plan provides beneficiaries with benefits the amount of which is determined ahead of time by the plan sponsor. The plan sponsor funds the plan with annual contributions.

2. In most cases, the greatest number of general account contractholders are owners of life insurance policies. General account contracts are also typically used to provide pension, disability, and health insurance benefits.

3. The "accumulation fund" is also commonly called an "active life fund" or a "purchase payment fund."

4. There are other amounts credited and debited to the account. For example, dividends may be credited to the account depending on investment experience, while typically, the account is often charged with a guaranteed expense rate.

The insurance company is contractually bound to use the entire accumulation fund, including accrued interest and without market value change, to purchase annuities for plan participants upon their retirement, utilizing a schedule of annuity purchase rates specified in the contract. Accordingly, the accumulation fund is reduced by the amount required to purchase the annuities. Plan participants who receive annuities are usually given an annuity certificate which unconditionally guarantees the payment of a fixed monthly benefit under the payment option selected by the participant.

A number of risks are borne by the insurance company issuing the DA contract. Although they vary from contract to contract, some of the obligations undertaken by the issuing company which involve elements of risk include guarantees of minimum rates of interest and principal to be credited to the contractholder's account, guarantees of annuity purchase rates, and obligations to pay certain amounts upon contract termination. More generally, an insurance company takes the risk that the mortality tables used might not have adequately anticipated either the number of plan participants living to retirement age or the age to which retirees actually survive. The principle obligation of the contractholder is to make the necessary premium payments.[5]

Since its development, the DA contract has been a popular choice for plan sponsors because of its flexibility, economy, effectiveness, and efficiency. In 1989, the American Council of Life Insurance estimated that of the $569 billion held by insurance companies under contracts with pension plans, about $448 billion was held under general account contracts like the DA contract. ACLI *1989 Life Insurance Fact Book Update* 25 (1989).

The agreement between Provident and Mack operated like most DA contracts. From 1972 to 1985, Mack made annual contributions to the Plan in the form of premiums paid on the DA contract. Under the terms of the DA contract, Mack's premiums were credited to a "guaranteed fund account,"[6] whereby they became part of Provident's general account.[7] Upon retirement of a Plan participant, Provident agreed to buy that participant a guaranteed benefit annuity pursuant to annuity purchase rates enumerated in the contract. Subtracted from the guaranteed fund was the purchase price of the annuity. Once the annuity was purchased, the amount of the participant's monthly benefit was fixed and guaranteed for life.

Provident also agreed to credit all premiums paid by Mack from 1972–77 with a minimum rate of interest established in the contract, through 1982. The minimum rate of interest credited after 1982 was left to Provident's discretion. Furthermore, Provident had the discretionary power to credit the guaranteed fund with interest above and beyond the minimum guarantees. If the guaranteed fund account continued to exist, Provident guaranteed the principal amount of the premiums and any accumulated interest as well. Mack had the unilateral right to terminate the payment of premiums and could select one of three contract termination options.

This arrangement was satisfactory to Mack until the mid–1970s, when the Plan administrator became concerned with what he perceived to be excessive expenses and inadequate investment experience, both of which had supposedly combined to raise the contributions required of Mack to unanticipated levels.[8] In efforts to cut funding costs, Mack twice amended the Plan, once in 1977 and again in 1983, with the end

---

**5.** This description of DA contracts is necessarily simplistic. For a more detailed discussion of DA contracts, *see* D. McGill, *Fundamentals of Private Pensions* at 525–536 (5th ed.1984).

**6.** The "guaranteed fund account" is no different than the "accumulation fund" discussed above.

**7.** The DA contract also provided Mack with the option to allocate some or all of its premiums to

an "Equity Fund," which was a separate account. Payments allocated to the Equity Fund were not to be part of Provident's general account. Mack never exercised this option.

**8.** Provident seems to contend that the higher premium payments were the result of an increased number of participants and a larger covered payroll.

result being decreased benefits for participants. By 1984, Mack had decided that the DA contract was too expensive to maintain. After a series of correspondences, Provident permitted Mack in 1985 to terminate the DA contract and to transfer the funds in that contract to another Provident contract without paying a penalty. The termination agreement worked out between Provident and Mack was, according to Mack, not one of the termination options set forth in the DA contract. Rather, it was an unpublicized option offered by Provident only on a case-by-case basis.

Thereafter, Mack filed this suit, complaining that Provident was a fiduciary under ERISA with respect to the DA contract at issue, and that Provident breached its fiduciary duties.[9] Mack alleged two breaches. First, it claimed that Provident failed to credit the guaranteed fund account of the DA contract with a sufficient amount of interest, even though the amount actually credited by Provident exceeded the contractual guarantees. Second, Mack contended that Provident failed to timely advise it of the non-contractual termination option eventually agreed to by the parties.

Following the district court's denial of Provident's motion for summary judgment, the matter proceeded to trial. At the close of Mack's case, Provident moved for involuntary dismissal under Fed.R.Civ.P. 41(b). The district court, relying on *Harris Trust & Savings Bank v. John Hancock Mutual Life Ins. Co.*, 722 F.Supp. 998 (S.D.N.Y. 1989), granted the dismissal motion on the theory that the DA contract administered by Provident was a guaranteed benefit policy as that term was defined in ERISA and therefore exempted from ERISA's fiduciary provisions. Mack then appealed.

## II.

■ The issue before us is narrow but important. Specifically, we are called upon to decide whether ERISA's fiduciary responsibility provisions apply to Provident's management of the assets it holds in its general account pursuant to the DA contract between it and Mack, or whether the guaranteed benefit policy exception of ERISA exempts the management of those assets from fiduciary responsibilities. Our review of the district court's interpretation of ERISA is plenary, *Chrysler Credit Corp. v. First National Bank and Trust Co.*, 746 F.2d 200, 202 (3d Cir.1984), while the district court's findings of fact are reviewed for clear error. Fed.R.Civ.P. 41(b).

■ Under ERISA, a person [10] is a fiduciary if, *inter alia*, he has discretionary authority or control over the management of plan assets. 29 U.S.C. § 1002(21)(A)(i). Since neither side seems to dispute that Provident had discretionary control over the premiums paid into the DA contract and kept by Provident in its general account, Provident would be a fiduciary for our purposes if those general account assets were "plan assets." The term "plan assets" is not defined in ERISA. However, section 401(b)(2) of ERISA unambiguously provides that assets maintained in a "guaranteed benefit policy" are not to be treated as plan assets:

> In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer.

29 U.S.C. § 1101(b)(2).

A guaranteed benefit policy is defined in section 401(b)(2)(B) as "an insurance policy or contract to the extent that such policy or

---

**9.** Also sued for breach of fiduciary duties were Meeker, Sharkey, Moffitt, Actuarial Consultants of New Jersey, and Thomas Sharkey. Mack consented to the dismissal of its case against Actuarial Consultants of New Jersey, while the district court granted summary judgment for Meeker, Sharkey, Moffitt, and Thomas Sharkey. Mack has not appealed the order granting summary judgment against these latter defendants, but rather, has only pursued its appeal against Provident.

**10.** A person is defined in ERISA as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9).

contract provides for benefits the amount of which is guaranteed by the insurer. Such term includes any surplus in a separate account, but excludes any other portion of a separate account." 29 U.S.C. § 1101(b)(2)(B). Whether the assets held in Provident's general account on behalf of Mack were "plan assets," then, depends on whether the DA contract at issue falls within the above definition of guaranteed benefit policy, and perhaps more generally, whether general account benefits contracts are guaranteed benefit policies.

The leading case on the scope of section 401(b)(2) and its insurance contract exemption is *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Ins. Co.*, 698 F.2d 320 (7th Cir.1983). In *Peoria Union*, the benefits contract at issue was a DA contract almost identical to the DA contract we have before us. The court broke down the contract into two separate stages: an accumulation phase, during which the paid premiums were held in the insurer's general account, and an annuity payment phase, which occurred once an annuity was bought for a retiree. *See SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 207, 87 S.Ct. 1557, 1559–60, 18 L.Ed.2d 673 (1967). While the contract was in its accumulation phase, stated the court, the "pension trustees did not buy an insurance contract with a fixed payout; they turned over the assets of the pension plan to Penn Mutual to manage with full investment discretion, subject only to a modest income guaranty." *Peoria Union*, 698 F.2d at

327. Thus, concluded the court, the insurer was a fiduciary with respect to assets it held in its general account pursuant to the DA contract because those assets were "plan assets." *Id.*[11] *See also Arakelian v. National Western Life Ins. Co.*, 724 F.Supp. 1033 (D.D.C.1989); *Jacobson v. John Hancock Mutual Life Ins. Co.*, 655 F.Supp. 1290, *withdrawn pursuant to settlement*, 662 F.Supp. 1103, 1112–13 (D.Conn.1987). *But see Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 729 F.Supp. 1162 (N.D.Ill.1989).

*Peoria Union*, however, was recently called into question by the *Harris Trust* decision. Before the court in *Harris Trust* was a general account contract similar to a DA contract.[12] Rejecting the two-phase analysis in *Peoria Union*, the court held that the guaranteed benefit policy exception in section 401(b)(2) protected the insurance company issuing the contract from the reach of the ERISA fiduciary requirements. Relying on the plain language of section 401(b)(2), its legislative history, and agency pronouncements, the court concluded that because the contract provided a fixed level of benefits to plan participants, namely an annuity upon retirement, it was a guaranteed benefit policy. The court deemed irrelevant the fact that certain payments due the plan sponsor were variable.

We believe the approach adopted by the *Harris Trust* court to be more logical than that utilized in *Peoria Union*. In particu-

---

**11.** The *Peoria Union* case came to the court of appeals after plaintiffs' complaint had been dismissed by the district court for failure to state a claim. Although the court of appeals reversed and then denied a petition for rehearing, it did note that new counsel for the defendant/appellee had made a number of arguments in its petition which the court had not previously considered. While declining to address the merits of these arguments, the court acknowledged that "the case is at an early stage and the appellee will have ample opportunity to present its arguments to the district court consistently with the flexible contours of the doctrine of law of the case." *Peoria Union*, 698 F.2d at 328. Many of these arguments were subsequently raised in the *Harris Trust* case. 722 F.Supp. 998. Because the *Peoria Union* court did not give full consideration to those authorities and contentions not drawn to its attention until the petition

for rehearing, its decision cannot be read as a rejection of those authorities and contentions. Indeed, had such arguments been made before the court of appeals prior to its decision on the merits, the result it reached might well have been different.

**12.** Specifically, the contract at issue was a retrospective immediate participation guarantee contract ("IPG contract"). IPG contracts are modified DA contracts designed to more directly and immediately reflect investment experience in the plan sponsor's unallocated fund. Both IPG and DA contracts feature employer contributions to an unallocated general account fund and guarantee full annuities for plan participants upon retirement. For a more detailed discussion of IPG contracts, *see* D. McGill, *Fundamentals of Private Pensions* at 536–538.

lar, there are several key phrases in section 401(b)(2)(B), which upon analysis, support the reasoning in *Harris Trust* and consequently, the district court's decision to follow *Harris Trust.*

Our discussion of section 401(b)(2)(B) begins with its second sentence, which reads: "Such term [guaranteed benefit policy] includes any surplus in a separate account, but excludes any other portion of a separate account." This sentence, when read in conjunction with section 401(b)(2), clearly makes a distinction between general account contracts and separate account contracts,[13] limiting the guaranteed benefit policy exception, for the most part, to the former. Since the DA contract issued by Provident is a general account contract, it meets this requirement.

By its terms, the guaranteed benefit policy exception only applies to "an insurance policy or contract." 29 U.S.C. § 1101(b)(2)(B). Insurance contracts are characterized by "the underwriting and spreading of risks." *Owens v. Aetna Life & Casualty Co.*, 654 F.2d 218, 224 (3d Cir.1988). The district court explicitly held that Provident assumed risks by issuing the DA contract to Mack, a finding not clearly erroneous. As the United States Supreme Court suggested in *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) (*"Valic"*), an annuity contract is an insurance contract if it "involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts." *Id.* at 71, 79 S.Ct. at 622.[14] Provident made just such a guarantee when it issued the DA contract, since plan participants for whom annuities were purchased received fixed benefits determinable by reference to the terms of the contract. Although *Valic* did not directly

address the issue before us, its observations are cogent and persuasive.

Aside from the guarantee of fixed benefits, Provident made a number of other guarantees, all involving elements of risk. For example, Provident guaranteed that there would be no impairment of the employer contributions to the Plan, thereby assuming the risk of a diminution of the principal due to negative investment experience. Provident guaranteed that a specific minimum rate of interest would be credited to the unallocated fund, thereby assuming the risk that the rate of return on its general account investments would fall below the guaranteed minimum rates. Provident guaranteed that annuities for retirees would be purchased at a rate consistent with a schedule set forth in the contract, thereby assuming the risk that interest rate assumptions underlying the rate schedule would not be realized due to a fall in interest rates. Moreover, Provident assumed the dual risks that more individuals than anticipated by the mortality tables reached retirement age, and that individuals who retired lived longer than had been calculated. The DA contract obviously transferred risk, and was therefore an insurance contract.

To be a "guaranteed benefit policy," a general account insurance contract must also "provide[ ] for benefits the amount of which is guaranteed by the insurer." 29 U.S.C. § 1101(b)(2). The DA contract issued by Provident meets this condition, since Provident guaranteed a life-long fixed level of benefits to any plan participant for whom it purchased an annuity under the contract. In fact, the district court found that "[t]his particular contract does provide for fixed payment to the plan beneficiaries

---

13. A "separate account" is defined as follows: The term "separate account" means an account established or maintained by an insurance company under which income, gains, and losses, whether or not realized, for assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company.
29 U.S.C. § 1002(17).

14. The Court in *Valic* held that a variable annuity contract was not a contract of insurance because "benefit payments vary with the success of the investment policy.... The holder of a variable annuity cannot look forward to a fixed monthly or yearly amount in his advancing years." *Valic*, 359 U.S. at 69, 79 S.Ct. at 620–21. At issue in this case is a DA contract which provides a fixed annuity.

when the annuities are purchased." App. at 393.

Nevertheless, Mack argues that the DA contract did not guarantee any benefit to its employees until annuities were actually purchased. Thus, it is Mack's position that the DA contract, while in its "accumulation phase" and before its "payment phase," was not a guaranteed benefit policy because it did not provide for guaranteed benefits. Although Mack correctly asserts that benefits are not guaranteed until the purchase of annuities, this argument misconstrues the term "provides" in the statute. The dictionary definition of "provide" is to "make, procure, or furnish for future use, prepare. To supply; to afford; to contribute." Black's Law Dictionary (5th ed.1979). A DA contract clearly "makes, procures, or furnishes for the future use" of the plan participants a fixed amount of benefits. Section 401(b)(2)(B) does not, on its face, require that the benefits contracted for be delivered immediately, and we will not read into the statute such a requirement. Rather, it is enough that the DA contract "provided" guaranteed benefits to plan participants at some finite point in the future.

■ Alternatively, Mack contends that since the interest credited to the unallocated fund was variable, the DA contract failed to provide for "benefits the amount of which is guaranteed." 29 U.S.C. § 1101(b)(2)(B). Again, Mack misconstrues a term in the statute. It reads the word "benefits" to include payments not only to plan participants, but to the plan sponsor as well. However, the term "benefit," when used in ERISA, uniformly refers only to payments due the plan participants or beneficiaries. *See Harris Trust*, 722 F.Supp. at 1017–18 ("Each time ERISA uses the word 'benefits,' it refers to the payments made to the employees themselves."); Goldberg & Altman, *The Case for the Nonapplication of ERISA to Insurers' General Account Assets*, 21 Tort & Ins. L.J. 475, 482 (1986) ("The term 'bene-

fit' is customarily used by the life insurance industry and in ERISA itself to mean payments to beneficiaries.").[15] *See, e.g.* 29 U.S.C. § 1002(7) (" 'participant' means any employee ... who is or may become eligible to receive a benefit of any type from an employee benefit plan"); 29 U.S.C. § 1002(8) (" 'beneficiary' means a person designated by a participant ... who is or may become entitled to a benefit"). This is in keeping with the overriding purpose behind the enactment of ERISA, which was to "protect ... the interests of participants in employer benefit plans and their beneficiaries." 29 U.S.C. § 1001(b). *See Massachusetts v. Morash*, 490 U.S. 107, 109 S.Ct. 1668, 1671, 104 L.Ed.2d 98 (1989). Mack's interpretation of "benefits," then, is overbroad and should not be adopted in this context. Payments made to plan sponsors can be variable without taking a DA contract out of the safe harbor created for guaranteed benefit policies.

In a similar vein, Mack argues that because the interest credited to its DA contract contributions was variable, the benefits due the Plan participants were in effect also variable. As support for its position, Mack maintains that poor investment experience twice forced it to enact benefit-reducing amendments to its Plan. Thus, Mack seems to believe that employee benefits are not truly guaranteed unless the employer's financial well-being, in the form of sound investments, is also guaranteed. While Mack's argument is not without some appeal, it essentially misses the point—the plan participants who retired received guaranteed benefits, just as they were promised, and just as section 401(b)(2)(B) required.

When Provident issued the DA contract to Mack, it promised annuities to plan participants upon retirement age. Mack made a corresponding promise to pay the necessary premiums. Instead of keeping that promise, Mack amended its Plan when the investment experience was not what it had anticipated, even though Provident credited

---

**15.** The authors of this article were, at the time of its publication, members of the Fiduciary Task Force of the American Council of Life Insurance (ACLI). The ACLI submitted an *amicus* brief on behalf of Provident which substantially reiterated the points made in the article.

Mack's unallocated fund with interest at a rate greater than for what had been contracted. Meanwhile, Provident continued to guarantee a fixed level of benefits consistent with the terms of the DA contract, and continued to comply with all the other conditions set forth in the contract. At the core of Mack's unhappiness, then, appears to be displeasure with its agreement with Provident. But this displeasure does not make the benefits guaranteed Mack's employees any less guaranteed. We agree with the *Harris Trust* court's observation that plaintiffs like Mack seem "to be arguing that in hindsight [they] do not like the bargain that [they] once struck." *Harris Trust*, 722 F.Supp. at 1017. Equally on point was its answer to this argument: a plan sponsor's dissatisfaction "should not change the terms of its contract, providing the covered employees are not prejudiced." *Id.* Since it is not disputed that Mack received exactly what it bargained for, and more importantly, that Mack's employees received exactly what Provident promised them, we see no reason why the guaranteed benefit policy exception should not apply. The connection between diminished benefits to Plan participants and Provident's interest-crediting practices is remote, at best.

A final limitation upon the definition of "guaranteed benefit policy" is that a general account insurance contract will only be a guaranteed benefit policy "to the extent" it provides for guaranteed benefits. Mack understands this clause to limit the applicability of the guaranteed benefit policy exception to that portion of the DA contract which actually guarantees benefits; in other words, the payment phase. Once again, though, we disagree with Mack's interpretation of the statutory language.

The phrase "to the extent" was probably added to "distinguish a contract under which fixed benefit annuity payments are promised from a contract under which the amount of some or all benefit payments is not guaranteed, such as a variable annuity contract under which the amount of benefit payments varies with the performance of a particular separate account." Goldberg & Altman, *The Case for the Nonapplication of ERISA to Insurers' General Account Assets*, 21 Tort & Ins. L.J. at 483. Therefore, a contract providing both fixed and variable benefits to employees would only be exempted from plan asset treatment with respect to the part of the contract which guaranteed fixed benefits. This interpretation would explain the existence of the second sentence of section 401(b)(2)(B), which as discussed above, states that assets held in separate accounts will not be considered a guaranteed benefit policy. Since most plans are of the defined benefit variety and offer fixed benefits of one sort or another, failure to include that sentence would have meant that any defined benefit plan which guaranteed any sort of fixed payment would be a guaranteed benefit policy, at least in part, whether the monies contributed to the plan were held in a separate or general account. Hence, the second sentence was necessary to close what would have been a very large loophole in the plan asset provisions of ERISA. *See Id.*

All benefits due plan participants under the DA contract at issue were guaranteed. There were no variable payments. Only payments owed to Mack could be considered variable.[16] As such, the entire DA contract comports with the "to the extent" limitation imposed on the definition of guaranteed benefit policy. Because the DA contract issued by Provident to Mack was a general account insurance contract which provided in its entirety for a guaranteed, fixed amount of benefits to be paid to the plan participants upon their retirement, we therefore conclude that, at least on its face, the guaranteed benefit policy excep-

---

**16.** The district court apparently was not convinced of this fact. It would only state that the contract at issue "might arguably provide for some tier of variable payments over and above the guaranteed yields to the employer." App. at 393. Of course, it was not necessary for the district court, nor is it incumbent upon us, to determine if the DA contract provided variable benefits to Mack, since we hold today that variable payments to the plan sponsor do not, by themselves, remove contracts from the safe harbor created by the guaranteed benefit policy exception to plan asset treatment.

tion of section 401(b)(2) encompasses the contract.

Our construction of section 401(b)(2)(B) does not stand alone, though. It is fully supported by the legislative history of the guaranteed benefit policy exception and by major agency pronouncements on the subject. The sole barometer of legislative intent with respect to section 401(b)(2) can be found in the Conference Committee Report, which states in relevant part:

> An insurance company also is not considered to hold plan assets if a plan purchases an insurance policy from it, to the extent that the policy provides payments guaranteed by the company. If the policy guarantees basic payments but other payments may vary with, e.g. investment performance, then the variable part of the policy and assets attributable thereto are not to be considered as guaranteed, and are to be considered as plan assets subject to the fiduciary rules....

> Additionally, it is understood that assets placed in a separate account managed by an insurance company are separately managed and the insurance company's payments generally are based on the investment performance of these particular assets. Consequently, insur-

ance companies are to be responsible under the general fiduciary rules with respect to assets held under separate account contracts, and the assets of these contracts are to be considered as plan assets....

Joint Explanatory Statement of the Committee of Conference, H.R.Rep. No. 93–1280, 93rd Con., 2d Sess. 296 (1974). As can be readily seen, the Conference Report basically tracks the language of the guaranteed benefits policy definition. However, it clarifies several important points. For example, there is no doubt that a distinction is to be made between variable and guaranteed benefits, with only contracts promising the latter eluding plan asset treatment. That would seem to verify our reading of the phrase, "to the extent that such ... contract provides for benefits the amount of which is guaranteed by the insurer," especially since there is no indication that the word "payments" in the Conference Report has a meaning different from the meaning we give to the word "benefits" in the statute. Moreover, the second paragraph of the quoted excerpt from the Conference Report makes the same differentiation we do between general and separate account contracts.[17]

---

**17.** To treat general account assets as plan assets, Provident argues, would throw the insurance industry into chaos. Specifically, the insurance industry has for years issued general account contracts to pension plans, and has never treated the general account assets attributable to employee benefit plans any differently than non-ERISA assets. Because insurance companies have never managed general account assets consistent with the fiduciary requirements of ERISA, a holding that they must would cast considerable doubt over their past and present business practices. Additionally, Provident claims that future management of general account assets would be difficult if those assets were subject to ERISA's fiduciary protections. For example, general account assets, whether connected to employee benefit plans or other non-ERISA insurance contracts, are subject to state regulation requiring that all contractholders be treated fairly and equitably. *E.g.,* N.J. Stat. Ann. §§ 17:27A–4; 17B:18–46; 17:29B–3, 4; 17:29B–4(7); 17B:30–3, 4; 17B:30–12–13 (West 1985). *See* 29 U.S.C. § 1144(b)(2) (state law governing insurance contracts shall not be preempted by ERISA). These state-imposed duties do not mesh easily with ERISA's requirement that plan assets be managed "solely in the

interest" of plan customers. Whenever an insurance company acts "solely in the interest" of a pension plan customer, it would violate state law. Whenever an insurance company takes actions to ensure that under state law, it is treating its policyholders fairly and equitably, it runs the risk of violating ERISA's fiduciary requirements.

We are not swayed by this parade of horribles. However, we do believe that if Congress had intended so severe a disruption of insurance practices, practices that had been in existence for almost three decades before the enactment of ERISA, it would have made its intention perfectly clear. After all, ERISA was expressly "designed to prevent a fiduciary 'from being put in a position where he has dual loyalties, and therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Levy v. Lewis,* 635 F.2d 960, 968 (2d Cir.1980) (citation omitted). There is no such clear indication in the legislative history of the guaranteed benefit policy exception. Indeed, the legislative history, as discussed above, points in the opposite direction. Without a mandate from Congress, then, we are reluctant to create "dual loyalties" for insurance companies.

A major pronouncement by the Department of Labor, which is the federal agency in charge of overseeing ERISA, also buttresses our interpretation of section 401(b)(2)(B). Interpretive Bulletin 75–2(b) (IB 75–2) provides:

> (b) *Contracts or policies of insurance.* If an insurance company issues a contract or policy of insurance to a plan and places the consideration for such contract or policy in its general account asset, the assets in such account shall not be considered to be plan assets. Therefore, a subsequent transaction involving the general asset account between a company will not, solely because the plan has been issued such a contract or policy of insurance, be a prohibited transaction.

29 C.F.R. 2509.75–2 (1982). As this regulation succinctly evidences, the Department of Labor, consistent with the result we reach today, does not consider general account assets held pursuant to insurance contracts to be plan assets. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (courts must defer to the interpretation of a statute rendered by the agency responsible for its enforcement, if based on a permissible construction of the statute).

Mack attempts to blunt the impact of IB 75–2 on its position by claiming that the regulation is not relevant to a discussion on the guaranteed benefit policy exception, since it purports to address the prohibited transaction sections of ERISA. *See Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.,* 729 F.Supp. at 1184–85 (*dicta*). But for a couple reasons, this argument proves untenable. First, while the "plan assets" regulation adopted by the Department of Labor in 1986 supplanted certain parts of IB 75–2, 29 C.F.R. § 2510.3–101, IB 75–2(b) was expressly left unaffected. Preamble to Plan Assets Regulation, 51 Fed.Reg. 41262, 41278. That IB 75–2 as a whole was even considered during the drafting of the regulation demonstrates its applicability to the identification of plan assets. But since the Department of Labor went one step further and chose to affirm the viability of IB 75–2(b) in the context of a plan assets regulation, we must assume that the regulation speaks authoritatively with respect to plan asset identification. Second, even if IB 75–2 is primarily a regulation directed to prohibited transactions, there is nothing barring its application to the guaranteed benefit policy provision. Indeed, it is entirely consistent with the language of section 401(b)(2)(B) and that section's legislative history. *See Id.* at 41262 ("Moreover, the fiduciary provisions of ERISA include prohibited transactions which restrict the manner in which fiduciaries may deal with the assets of a plan."). IB 75–2 therefore has a high degree of relevance to the issue we address today.[18] Hence, the district court's con-

---

**18.** We acknowledge that two letter rulings cited by Mack from the Department of Labor seem to contradict IB 75–2. In Advisory Opinion 83–51A (Sept. 21, 1983), the Department of Labor states that a:

> separate account would not hold "plan assets" for purposes of the fiduciary responsibility provisions of ERISA if it is maintained by an insurance company solely in connection with its fixed contractual obligations and if neither the amount payable (or credited to) the plan or to any participant or beneficiary of the plan (including an annuitant) is affected in any way by the investment performance of the separate account.... We note, however, that a conventional separate account (which holds contributions received from a plan and provides for the crediting of income on such amounts based upon the investment experience of the separate account) would not be considered to be maintained in connection with a fixed contractual obligation of the in-

surance company merely because assets of the separate account are ultimately applied to provide fixed annuities to participants, and the assets of such a separate account would be considered to be plan assets.

Similarly, the Department of Labor noted that:

> The [Conference Report on section 401(b)(2)(B)] evidences a Congressional intent that when an insurance company provides investment advice which determines the rate of return to the plan and its participants, the assets in the account shall constitute plan assets so that the insurance company is subject to the fiduciary provisions of the Act.

Advisory Opinion 78–8A (March 13, 1978). However, letter opinions "'apply only to the situation described therein. Only the parties described in the request for opinion may rely on the opinion.'" *Harris Trust,* 722 F.Supp. at 1019 (quoting ERISA Procedure 76–1, § 10, 41 Fed. Reg. 36,281 (Aug. 27, 1976)). Moreover, Adviso-

struction of ERISA section 401(b)(2)(B) is entirely consistent with the statutory language of that section, its legislative history, and the interpretations given that provision by the Department of Labor.[19]

### III.

To summarize, then, the exception to plan asset treatment set forth in ERISA section 401(b)(2) is limited to guaranteed benefit policies. To fit within the statutory definition of a guaranteed benefit policy, the contract must be a general account insurance contract in which the issuing insurance company guarantees to the plan participants a fixed amount of benefits, payable at a clearly stated time. Any portion of the contract which provides for variable, rather than guaranteed benefits, is not a guaranteed benefit policy. We hold that the DA contract issued by Provident to Mack is, in its entirety, a guaranteed benefit policy. As such, the contract's assets are not subject to plan asset treatment,[20] and since a person can only be a fiduciary with respect to plan assets, the district court correctly found that Provident was not a fiduciary in this instance. We will therefore affirm. Each side to bear its own costs.

---

ry Opinion 83–51A is clearly addressed to an issue arising under a separate account, and therefore adds nothing to our discussion of general account contracts. Advisory Opinion 78–8A is likewise of no value; despite a suggestion by the party requesting the opinion that its account was a general account, the Department of Labor chose to treat that account as a separate account as well. *Id.*

19. Mack makes a final argument regarding section 401(b)(2), suggesting that the phrase, "solely by reason of the issuance of [a guaranteed benefit policy]," means that even if the DA contract was a guaranteed benefit policy, it could be removed from its safe harbor for other reasons. Rather than articulating independent grounds that would trigger this result, Mack seems to merely reiterate its claim that the DA contract is not an insurance contract. Even if

Mack had set forth concrete reasons for nullifying the DA contract's exemption under the guaranteed benefit policy exception, we do not find its interpretation of section 401(b)(2) to be correct. We understand the phrase, "solely by reason of the issuance of [a guaranteed benefit policy]," to be synonomous with "for no reason other than the issuance of a guaranteed benefit policy" In other words, the sole predicate for activating the guaranteed benefit policy is the issuance of a guaranteed benefit policy.

20. This is not to say that Mack's Plan had no assets at all. The "assets" of the Plan were the contract itself, and the bundle of rights associated with the contract. Presumably, then, if Provident had breached any provision in the contract, Mack would not only have an action for breach of contract, but would also have an action for breach of ERISA fiduciary duties.