HARRIS TRUST & SAVINGS BANK, as Trustee of the Sperry Master Retirement Trust No. 2, Plaintiff,

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Third–Party Plaintiff,

v.

CHASE MANHATTAN BANK, N.A., Counterclaim Defendant,

and

Sperry Corporation and the Retirement Committee of Sperry Corporation, Third–Party Defendants.

No. 83 Civ. 5401 (RPP).

United States District Court, S.D. New York.

July 12, 1991.

As Amended Aug. 6, 1991.

---

Anderson Kill Olick and Oshinsky, P.C., New York City by Lawrence A. Kill, for plaintiff Harris Trust and Sav. Bank.

Reboul, MacMurray, Hewitt, Maynard and Kristol, New York City by Howard G. Kristol, for defendant and third-party plaintiff John Hancock Mut. Life Ins. Co.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Defendant John Hancock Mutual Life Insurance Company ("Hancock") moves pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Agreed Statement of Facts stipulated by the parties on November 23, 1988 (hereinafter "A.S.F. ¶ __") to dismiss the remaining claims of plaintiff's amended complaint. By its opinion and order dated September 26, 1989, this Court dismissed plaintiff's claim asserted under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"). This motion relates to plaintiff's contract and common law claims.

The claims in this action arise out of or relate to Group Annuity Contract No. 50 ("GAC 50"), which was first entered into in 1941 by the defendant and Sperry Corporation ("Sperry") and covered non-bargaining unit employees of Sperry Gyroscope, Sperry Division.[1] A.S.F. ¶ 5; Hirschberg Tr. 18. Pursuant to GAC 50's original terms, Sperry purchased on an annual installment payments basis deferred annuities from Hancock payable for life to Sperry employees or their beneficiaries to the extent that the employees and beneficiaries would be entitled to such a payment upon the employees' retirement, according to the terms of Sperry's retirement plan. A.S.F. ¶ 6. In other words, once a covered employee's benefits vested under the plan, Hancock would guarantee those benefits. *Id.* ¶ 10. By agreement between the parties, GAC 50 has undergone substantial changes since

1941. Most relevant to this motion are those that occurred in 1968 and 1977.[2]

Effective January 1, 1968 GAC 50 was converted by amendment from a deferred annuity form of participating contract under which Sperry purchased deferred annuities from Hancock on an annual basis for the non-bargaining unit of the Sperry Gyroscope Division to a Retrospective Immediate Participation Guarantee form ("Retro-IPG") under which it guaranteed benefits for each eligible employee under GAC 50 for that employee who was also eligible under the terms of the Sperry Rand Retirement Trust No. 2 (the "Plan" or the "Sperry Trust"). A.S.F. ¶ 23.

Hancock IPG contracts are participating contracts in that the purchaser shares in the aggregate of the contract's mortality, expense and investment experience to the extent that that experience is more favorable than the experience assumed in the contract's purchase rates. *Id.* ¶ 11. Net investment income from Hancock's General Account allocated to an IPG contract is directly credited on an annual basis to that contract's Pension Administration Fund ("PAF").[3] The amount of the PAF depends in part on the investment performance of Hancock's General Account and the allocation of that performance to the IPG.[4]

Pursuant to the 1968 amendment, annuities purchased for certain employees up to December 31, 1967 were "cancelled," but Hancock continued to guarantee benefits to those employees and their beneficiaries. A.S.F. ¶ 32. The 1968 amendment also established a method for the provision of additional guaranteed benefits to be pay-

---

1. The factual background of this litigation is contained in large part in this Court's opinion of September 26, 1989, 722 F.Supp. 998. GAC-1150 covered the bargaining unit employees of the Sperry Gyroscope, Sperry Division.

2. In 1968 Sperry determined to modify its method of funding employee pensions so that future retirees would not be provided guaranteed pension benefits from an insurance company but would look to investments of the Sperry retirement account to pay pension benefits. (Hirschberg Tr. 16, 78, 94)

3. The deferred annuity form of contract had ultimately distributed such net experience to the

contract holder as dividends. A.S.F. ¶¶ 17, 19. For purposes of this opinion "PAF" shall also include the Contingency Account which was part of the General Account (GAC 50, Article I, Section 18) since the parties' arguments do not rely on any distinction of consequence between the Contingency Account and the PAF.

4. Under the 1968 amendment, Hancock guarantees that the PAF on any date will not be less than it otherwise would have been if the sum of the net interest earned and capital gains and losses apportioned to the PAF had always been zero from January 1, 1968. A.S.F. ¶ 27.

able for the period after December 31, 1967 as more fully described in this Court's earlier opinion. In essence, if GAC 50's PAF exceeded its Minimum Operating Level ("MOL"), which was equal to 105% of the Liabilities of the Fund ("LOF"), Hancock would guarantee the payment of the additional guaranteed retirement benefits to those employees.[5] *Id.* ¶ 39.

Effective August 1, 1977 GAC 50 was converted to a Retrospective Immediate Participation Guarantee/Prospective Deferred Liability form of contract ("Retro–IPG–PDL") under which the employees retiring thereafter received some benefits guaranteed by Hancock and relied on Plan assets for the remainder. Under the 1977 amendment GAC 50's LOF would not be increased automatically upon the subsequent retirement of any employee and new retirement benefits would not be guaranteed automatically by Hancock. A.S.F. ¶ 80. The Sperry Retirement Committee ("SRC") could request that Hancock establish guaranteed benefits in addition to the benefits already guaranteed, but it did not do so. *Id.* ¶ 81. The 1977 amendment also permitted Sperry to designate employees eligible for non-guaranteed benefits and provided for the payment of such benefits by Hancock from the PAF or its Contingency Account within Hancock's General Account. Although the Sperry Retirement Committee did not request Hancock to pay any new guaranteed benefits subsequent to the effective date of the 1977 amendments, the Committee did designate that monthly payments of non-guaranteed benefits be paid to certain employees in 1977 and Hancock paid such non-guaranteed benefits through June 1982, when it gave Sperry 31 days notice in writing that it would no longer pay non-guaranteed benefits.

Hancock contends that it at all times fully performed its obligations under GAC 50 and its amendments and is entitled to summary judgment dismissing plaintiff's breach of contract claims. It further claims that plaintiff's claims for breach of fiduciary duty and for breach of an implied covenant of good faith and fair dealing must also be dismissed since all obligations of Hancock to the plaintiff arise solely from and are defined by the provisions of GAC 50.[6]

## I. *Contract Claims*

■ Where the language of a contract is unambiguous the question of interpretation is one of law to be answered by the court without reference to extrinsic evidence. *See Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir. 1985). If the language of a contract is otherwise plain, the parties cannot create a genuine issue of material fact simply by urging different interpretations. *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989).

### 1. Did Hancock Improperly Retain Excess Funds Allocated to GAC 50?

In or about May 1982 Hancock denied a request from the Sperry Retirement Committee for a transfer of assets under what the parties had come to refer to as a "rollover procedure." Hearing Exh. 2.

It is necessary to refer to the history of GAC 50 to understand the reason for the dispute.

Prior to 1968, the Sperry Retirement Committee did not manage pension funds for its employees. At the time of the 1968 Amendment, the Committee took on a num-

---

**5.** If GAC 50's PAF balance fell below the amount of the LOF (or the amount of the PAF and Sperry's supplemental fund balances together fell below the amount of the MOL), Hancock could ask Sperry for a contribution. If the PAF balance was not at least equal to the LOF or if the GAC 50's PAF and supplemental fund were not equal to the MOL, the PAF would terminate and the contract would function thereafter as a deferred annuity contract pursuant to which Hancock had to provide annuities for all guaranteed benefits. A.S.F. ¶¶ 36, 40, 42.

**6.** On July 29, 1988, the parties submitted a proposed joint pretrial order to Judge Cedarbaum in which plaintiff's claims were identified as ERISA claims and common law claims. At a conference on September 16, 1988, Judge Cedarbaum authorized bifurcated motions for summary judgment along those lines. The ERISA motion has been decided. This motion is intended to dispose of the action.

ber of investment managers to manage various funds for the Plan to provide retirement benefits for its employees upon retirement. (Hirschberg Tr. 13–14) Starting in 1968, Hancock, in addition to providing guaranteed benefits under GAC 50 and similar annuity contracts, received responsibility from Sperry to manage for the Plan a smaller separate account, an equity investment account. (Hirschberg Tr. 14) Funds in the separate account, like the funds distributed to other investment managers retained by the Retirement Committee, did not provide guaranteed benefits and were assets of the Plan. (*Id.*) By 1977 it became evident to Hirschberg that the other fund managers were providing the Retirement Fund with a better rate of return than Hancock's General Account and he determined that the cost of the benefits guarantee provided by Hancock was excessive. Accordingly, Sperry's Retirement Committee desired to remove funds from Hancock's General Account and place them in other funds over which it could exercise more investment control. (Hirschberg Tr. 11, 15).

By the 1977 amendment, an employee who retired after 1977 had those benefits which had accrued prior to 1968 guaranteed by Hancock and those non-guaranteed benefits which accrued thereafter were funded only by the Plan's assets.[7] The Committee wanted to move so-called "excess funds" out of Hancock's General Account. It was in this context that Hirschberg explored ways with Hancock as to how a removal of excess funds might be achieved without incurring the contract's Asset Liquidation Adjustment ("ALA"). As an example, in 1977 the GAC 50 had an excess of funds in the General Account,

whereas the GAC–1150, another Sperry guaranteed benefit contract, required a transfer of funds into its pension administration fund in the General Account to satisfy its annuity funding requirements. The Committee did not want to liquidate its equity portfolios in the separate accounts at Hancock to meet GAC–1150's shortfall. (*Id.* at 19) To meet this problem, so-called "excess funds" in GAC 50 were transferred by agreement of the parties to the separate accounts and then to GAC–1150 for its pension administration fund in the General Account. Hearing Exhs. L, T.[8] The net effect was to leave the balance of the General Account unchanged and no asset liquidation charge was imposed.

Hirschberg continued at meetings between representatives of both companies to press for the reduction of funds in GAC 50's General Account. Thereafter in 1979 and 1981 Hancock permitted the Committee pursuant to so-called "rollover arrangements" to withdraw certain amounts of "excess" funds from the PAF without the ALA required under GAC 50. Hearing Exhs. 4, 5, 11; Jefferson Tr. 46; Hirschberg Tr. 50. Hancock acknowledges it had a "rollover" policy which it offered to General Account customers whose balance of funds in that account exceeded liabilities by 20 percent and some other criteria, whereby the excess of cash inflow over cash outflow, plus 4% of the beginning fund balance of a PAF, could be transferred out of the General Account.[9] A.S.F. ¶ 77. In 1979 a rollover was offered to Hirschberg and accepted. In 1980 Hancock altered its policy and eliminated rollovers, except for "grandfathered" customers. (Penney Tr. 137) In 1981 Sperry asked for a rollover for 1980 and received it. Subsequently in

---

**7.** An employee covered by GAC–50 who retired prior to 1977 had all his or her benefits guaranteed by Hancock. One of the Committee's purposes in effecting the change was to stop the growth of guaranteed benefits (Hirschberg Tr. 17) and increase the funds under the investment control of the Committee.

The 1977 amendment required Hancock to issue newly-worded certificates to retiring employees. Jefferson Tr. at 22.

**8.** The excess funds were evidently transferred by Hancock's waiver of one of the requirements

of the rollover transfer for direct-rated participating IPG contracts. Exh. 10, Pl.Exh. Binder.

**9.** Due to the guarantee provisions and state insurance laws or regulations, investments carried in the General Account were generally long-term investments, in very large part fixed income securities. After 1959 each year's investments were part of a "cell" carried at book value. A.S.F. ¶ 20. However, although the investments were long term, certain liquidations would occur during a year and those funds less offsets were utilized for rollovers.

1981 Hancock eliminated rollovers for all customers. (*Id.* at 139)

Plaintiff maintains that these rollover withdrawals were by contract amendment pursuant to oral agreement of the parties and that it had a contractual right to such rollovers for every subsequent year. As evidence of that agreement plaintiff relies not on language of the contract or any formal written amendment thereto but on oral understandings which all witnesses for the defendant deny. To support its claim, plaintiff relies on two Hancock internal memoranda, Exhibits 10 and 12, a memorandum dated March 28, 1977 and a memorandum dated December 31, 1981, respectively. Exhs. 10 & 12, Plaintiff's Exhibit Binder Submitted in Opposition to Defendant's Motion to Dismiss filed Mar. 23, 1990 (hereinafter "Pl.Exh. Binder").

■ Although both these memoranda make reference to rollover arrangements and plaintiff's participation in them, they do not constitute amendments to the contract requiring a continuation of such rollovers.

In the first place, it is highly unlikely that any officer of either company expected a contract of this complexity and involving the amounts in question to be amended orally. Other amendments were made in writing. Furthermore, there are no references to amending the contract in either exhibit. Without such references and without an indication that Hancock was seeking to be bound contractually to permit future rollovers, the Statute of Frauds is not satisfied.

Neither exhibit contains expressly or by reasonable implication all the material terms of the agreement. Nor is there any indication of a continuing obligation with respect to "rollovers." [10] Under these circumstances the exhibits are insufficient proof of an agreement to be bound in futuro under the Statute of Frauds. *See Fort Howard Paper Co. v. William D. Witter,*

*Inc.,* 787 F.2d 784, 791 (2d Cir.1986); *Scheck v. Francis,* 26 N.Y.2d 466, 472, 260 N.E.2d 493, 311 N.Y.S.2d 841 (1970); *Morris Cohon & Co. v. Russell,* 23 N.Y.2d 569, 575, 245 N.E.2d 712, 297 N.Y.S.2d 947 (1969).

■ Plaintiff argues that partial performance removes the agreement from the Statute of Frauds. Plaintiff points to the 1979 and 1981 "rollovers" as evidence of partial performance of the continuing obligation to provide rollover as satisfaction of Hancock's Statute of Frauds defense. "The doctrine of part performance may be invoked only if plaintiff's actions can be characterized as 'unequivocally referable' to the agreement alleged." *Anostario v. Vicinanzo,* 59 N.Y.2d 662, 663, 450 N.E.2d 215, 463 N.Y.S.2d 409 (1983). *See Tribune Printing Co. v. 263 Ninth Ave. Realty, Inc.,* 88 A.D.2d 877, 878–79, 452 N.Y.S.2d 590 (App.Div. 1st Dep't), *aff'd,* 57 N.Y.2d 1038, 444 N.E.2d 35, 457 N.Y.S.2d 785 (1982). Here plaintiff's requests for withdrawals are explainable as a response to Hancock's alleged notification in August 1979 of the existence of the rollover as a generalized procedure. Pl.Mem. in Opp. at 35. They are not "unequivocally referable" to an amendment of the contract.

The Court also notes that New York Jurisprudence 2nd states that for the doctrine of partial performance to apply, "[t]he acts of part performance must have been done by the person insisting upon the contract." 61 N.Y.Jur.2d *Statute of Frauds* § 254 at 396 (1987). Here the claimed acts of part performance are by Hancock who disavows any such modification of the contract.

■ As for plaintiff's argument that promissory estoppel applies, that claim does not lie because plaintiff alleges no acts that were taken by it in reliance on the alleged oral promises of Hancock. *See Republic Nat'l Bank of New York v. Sabet,* 512 F.Supp. 416, 426 (S.D.N.Y.1980), *aff'd,*

---

**10.** It is true that Hancock's Philip Jefferson, in seeking approval by Hirschberg of a proposal to revalue the LOF, indicated that rollover would not be discontinued if the proposal were adopted (Exh. 12 at 3, Pl.Exh. Binder), but this implies that Hirschberg realized at the time there was no right to rollovers under the contract and the writing does not constitute a commitment to continuation of rollovers.

681 F.2d 802 (2d Cir.1981), *cert. denied,* 456 U.S. 976, 102 S.Ct. 2241, 72 L.Ed.2d 850 (1982). Accordingly, the Court finds as a matter of law that the Statute of Frauds bars plaintiff's claim to a right to rollover for the years subsequent to 1980.

### 2. Termination of Non–Guaranteed Benefits

■ This dispute between the parties centers on the meaning of the 1968 and 1977 amendments and actions relating thereto. Plaintiff claims the failure of Hancock to continue to pay non-guaranteed benefits after June 1982 constitutes a breach of contract.[11]

■ A significant event which preceded Hancock's alleged breach occurred in May 1982 when Hancock was notified by the Committee that the Committee had amended the Sperry Plan by expanding it to include retired employees of Sperry's Univac Division within the category of employees entitled to receive non-guaranteed benefits under GAC 50 and was requesting payment of non-guaranteed benefits to such employees.[12] A.S.F. ¶ 84. Hancock at first took the position that the Sperry Plan only contemplated payment of non-guaranteed benefits, such as cost-of-living adjustments, to employees already covered by the Plan.

(Hirschberg Tr. 41). When Sperry demurred, Hancock took the position that it was entitled to discontinue unilaterally payments of all non-guaranteed benefits under the terms of Article IV, Section 9, paragraph (c) of GAC 50 and gave the Committee 31 days notice in writing that it would terminate all such payments. Exh. 4, Pl. Exh. Binder.

Plaintiff maintains that Hancock was only entitled to give notice of termination of such payments if the amount of the Pension Administration Fund became insufficient to support the making of "Non–Guaranteed Benefit" payments.

The provision relied on by Hancock reads as follows:

SECTION 9. Payment of Non-guaranteed Benefits

Non-guaranteed Benefit payments shall be payable to a payee, provided the Pension Administration Fund is sufficient for the purpose, upon written notice from the Sperry Rand Retirement Committee to the Company. Such notice shall specify the payee's Benefit Commencement Date and the amount, form and manner of such Non-guaranteed Benefit payments. Non-guaranteed Benefit payments shall continue until

(a) the date of death of the payee,

---

**11.** Because a "guaranteed benefit policy" is exempt from ERISA only "to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer," 29 U.S.C. § 1101(b)(2)(B), it could be argued that funds in GAC 50's PAF devoted to non-guaranteed benefits are subject to ERISA even though they are held in Hancock's General Account. Under 29 U.S.C. § 1101(b)(2)(B):

(2) In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer. For purposes of this paragraph:

. . . .

(B) The term "guaranteed benefit policy" means an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer. Such term includes any surplus in a separate account, but excludes any other portion of a separate account.

Non-guaranteed benefits were paid not from segregated assets or a separate account but from

surplus or so-called "excess funds" in GAC 50's PAF. Under the second sentence of subdivision (B), surplus held by an insurer in a separate account is not subject to ERISA because it falls within the "guaranteed benefit policy" exception. There is no reason to deny similar exemption to so-called "excess funds" under GAC 50 even though they are held in Hancock's General Account rather than in a separate account. "ERISA was designed to prevent a fiduciary 'from being put in a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Levy v. Lewis,* 635 F.2d 960, 968 (2d Cir.1980) (citation omitted). If Congress had intended ERISA's fiduciary requirements to apply to surplus held in an insurer's general account, it would have made its intention clear. *See Mack Boring & Parts v. Meeker Sharkey Moffitt,* 930 F.2d 267, 275 n. 17 (3d Cir.1991).

**12.** The Univac Division manufactured Sperry's large computers and its employees had not been covered by GAC–50.

(b) the date as of which the Retirement Committee notifies the Company, in accordance with the next paragraph, that such Non-guaranteed Benefit payments are to be canceled, suspended, or adjusted,

(c) the date as of which the Company, by written notice filed with the Retirement Committee at least thirty-one days prior thereto, declares its intention to cease such payments,

(d) the date the Pension Administration Fund ceases to exist.

The Retirement Committee shall have the right to notify the Company that Non-guaranteed Benefits provided under this Contract shall be canceled, suspended or adjusted on and after the date specified by the Retirement Committee. Such notice must be in writing and be received by the Company at its Home Office prior to the date of cancellation, suspension or adjustment. On and after the date of cancellation or suspension specified in such notice, no further payments shall be made by the Company with respect to the Non-guaranteed Benefits provided for payees included in any cancellation notice or during the period of suspension for payees included in any suspension notice, and the Company shall have no responsibility with respect to any Non-guaranteed Benefits which may be canceled, or if Non-guaranteed Benefits are suspended, during the period of suspension. On and after the date of the adjustment specified in such notice, the liability of the Company with respect to the Non-guaranteed Benefits provided for payees included in such notice shall be equal only to the liability for the adjusted Non-guaranteed Benefits provided in such notice for such payees.

GAC 50, 1977 Amendment, Article IV, Section 9.

The Court's reading of the plain meaning of this Section is that, provided the PAF is sufficient for the purpose, Hancock shall initiate non-guaranteed payments to employees designated upon notice from the Committee and shall continue making such payments until (a), (b), (c) or (d) occurs.

Plaintiff argues that the PAF Fund was sufficient to make the payment of the non-guaranteed benefits to the Univac employees at the time of Hancock's termination and that until such date as the PAF was insufficient for that additional purpose, Hancock had an obligation to provide non-guaranteed benefits to the Univac employees. It bases its argument primarily on Article II, Section 3, which reads as follows:

Section 3. Non–Guaranteed Benefits

The Retirement Committee shall notify the Company in writing of the Benefit Commencement Date of an employee in advance of such date, and shall furnish such other information with respect to the employee or his designated survivor as is necessary to provide the Non-guaranteed Benefit.

The monthly amount of Non-guaranteed Benefit to be provided hereunder for an employee shall be the amount to which he is entitled on such date in accordance with the Plan as determined by the Retirement Committee. The determination of eligibility for and the amount of such Non-guaranteed Benefit shall be made solely by the Retirement Committee and the Company shall have no responsibility for such determination.

On and after the Benefit Commencement Date of an employee, the Non-guaranteed Benefit for such an employee or his designated survivor shall be payable hereunder in accordance with the Plan until the earliest of the date of his death, the date the Retirement Committee notifies the Company in accordance with Section 9 of Article IV that said Non-guaranteed Benefit payments are to be canceled, suspended or adjusted, or the date the Pension Administration Fund is not sufficient to provide the Non-guaranteed Benefits for the payee.

GAC 50, 1977 Amendment, Article II, Section 3.

Plaintiff also bases its argument on the following language added to Article III, Section 2, by the 1977 Amendment:

Section 2. Pension Administration Fund

a. The following heading is inserted immediately following the Section title: "A. Applicable to Guaranteed Benefits"

b. The following paragraph and succeeding heading are added immediately following the second paragraph of this Section:

"B. Applicable to Non-guaranteed Benefits

On the Benefit Commencement Date of an employee and on each date thereafter on which a Non-guaranteed Benefit is due with respect to an employee on or before the date of termination of the Fund, a Non-guaranteed Benefit shall be provided hereunder with respect to each employee entitled thereto. The Company shall be liable for any amount of Non-guaranteed Benefit expressed to be payable only to the extent to which the Fund is sufficient to provide such amount.

C. Applicable to Guaranteed and Non-guaranteed Benefits"

GAC 50, 1977 Amendment, Article III, Section 2(B).

Article III is entitled "Contributions" and relates to the method of computing how contributions from Sperry to the Plan were to be calculated. Accordingly, it does not appear to be relevant to Hancock's right to terminate non-guaranteed benefits.

Plaintiff argues that Article II, Section 3, Article III, Section 2, and Article IV, Section 9, can only be read in harmony if they are read as plaintiff suggests, and that where two terms of a contract irreconcilably conflict, the first term, i.e., Article II, Section 3, governs. It has also asked the Court to look to extrinsic evidence in the form of an affidavit of its former Vice President, Thomas Hirschberg, who was ultimately responsible for managing the Plan, stating that he believed Hancock had no right to terminate such payments. Reference to such extrinsic evidence is unnecessary because the structure of the contract as testified to by witnesses for both parties makes the meaning of the contractual language clear.

At a hearing held on dates in December 1990 and January 1991 to determine whether there existed a genuine issue of fact on this issue and the rollover issue, it became evident that the history of the GAC 50 contract had a bearing on the constructions the parties were asking the Court to make. In the words of Kenneth Crafts, Sperry's retired employee, who had immediate responsibility for a lengthy period of time for the administration of GAC 50, Article II had originally actually been Sperry's group annuity plan for the covered employees and the retirement benefits to be available for these employees were designated thereunder. In this form, GAC 50 existed as the guaranteed benefit deferred annuity benefit plan for the employees until 1968. (Crafts Tr. 40–41)

Crafts stated that Article II was "the description of how benefits accrue for an employee." (*Id.* 41) Crafts stated Article IV, on the other hand, "defines how the benefits will be paid to the employee by Hancock, various forms of annuities, the date they start and the date they end, and the forms of annuity that he can have." (*Id.* 42) Hirschberg testified similarly that Article II "is restricted to the date of coverage and the definition of the retirement annuity," whereas Article IV covers "retirement annuity provisions, the mode of payment." (Hirschberg Tr. 30) This testimony was consistent with that of Judy Bennett, a former executive of Hancock, who drafted the 1977 amendment and made clear that Article IV, Section 9, paragraph (c) was drafted to protect Hancock. (Bennett Tr. 108, 125–26) The Court notes that by the 1977 Amendment the title of Article IV was changed to clarify its content to "Provisions Pertaining to the Payment of Benefits."

Since the alleged conflict in language between Article IV, Section 9, and Article II, Section 3, relied on by plaintiff is resolved by the underlying structure of the contract itself, as to which there is no genuine issue of material fact, plaintiff's position is rejected. Accordingly, Hancock's termination of non-guaranteed benefits in 1982 did not constitute a breach of contract.

### 3. Revaluation of the Rate Tables

The plaintiff next argues that Hancock breached GAC 50 by not revaluing GAC 50 rate tables (interest assumptions) with respect to pre–1968 annuities.

■ The provision of GAC 50 key to a determination of this issue is the second paragraph of Article III, Considerations, Section 2, Pension Administration Fund, which in pertinent part reads as follows:

> The Company shall re-determine on each Valuation Date on or before the date of termination of the Fund the Liabilities of the Fund, using on account of an employee, Contingent Annuitant and beneficiary to whom Retirement Annuity payments are then being made, the same rate basis and Table in Article VI as was applicable on the date an Annuity first became payable to the employee, Contingent Annuitant or beneficiary, whichever is applicable; provided, however, that with respect to any amount of annuity which was cancelled on January 1, 1968, in accordance with Section 1 of this Article, the rate basis and Tables in Article VI which were applicable on January 1, 1968 shall be used unless otherwise agreed upon between the Employer and the Company.

GAC 50, Article III, Section 2.

Plaintiff argues that the language shows the parties contemplated a revaluation of the rate and valuation tables and that Hancock had a duty to renegotiate in good faith the application of the rate valuation tables.

The language of Article III, Section 2, is that the rate basis and tables in Article IV applicable on January 1, 1968 *"shall* be used unless otherwise agreed upon."

Such language is at most an agreement to try to agree. As such, it is not enforceable. *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 417 N.E.2d 541, 436 N.Y.S.2d 247, 249 (1981). Accordingly, this claim of plaintiff is dismissed.

### 4. Assessment of Risk Charges

The plaintiff disputes Hancock's assessing a risk charge of 1% of the GAC 50 Pension Administration Fund's and the Contingency Account's share of net interest earned on Hancock's General Account. This claim rises and falls on the Court's determination of whether Hancock had an obligation to reduce excess funds by payment of non-guaranteed benefits and by permitting rollover. Since the Court has already determined Hancock's acts in connection with those two issues were permitted by the contract, this claim also fails. The 1% risk charge was permitted by the 1968 Amendment to Article III, Section 3.[13]

### 5. The Asset Liquidation Adjustment

■ Next, the plaintiff argues that the defendant breached GAC 50 by misapplying and miscalculating the Asset Liquidation Adjustment ("ALA"). An ALA is applied when the contractholder requests a transfer or withdrawal from defendant's General Account. The ALA is applied to adjust the transferable balance (the excess of PAF over LOF) to reflect the current market value of the assets underlying Hancock's guarantee of benefits. Debits and credits to the PAF are charged or credited to that account in dollar amounts at book value. The underlying assets, those in Hancock's General Account, however, fluctuate in market value. As interest rates vary such fluctuations can be large since the investments are overwhelmingly long-term investments. In the event a contractholder requests a transfer of the Transferable Balance (the amount by which the PAF exceeds the LOF), a formula applicable to all contracts of the same class invested in the General Account is applied to determine the Transferable Balance in order to reflect the current market value of its share of the underlying assets. This adjustment is the ALA. GAC 50, Article III, Section 9. A market value adjustment

**13.** Article III, Section 3, reads as follows:

The Company shall add to the Fund, as of each December 31st subsequent to January 1, 1968, the Fund's share and the Contingency Account's share of the net interest earned and apportioned to the Group Annuity Branch of the Company for the calendar year ending on such December 31st, less 1% of such share.

may be positive or negative. If interest rates are higher at time of transfer than on purchase of the investments, the market value adjustment is negative. *See* D. McGill, Fundamentals of Private Pensions 535 (5th ed. 1984). The Court takes judicial notice of the high interest rates prevailing in the late 1970's and early 1980's over those in previous years.

 Plaintiff claims Hancock breached GAC 50 by "arbitrarily and improperly imposing and calculating an assets liquidation adjustment." Pretrial Order, Plaintiff's Contentions of Law ¶ 23(e). Plaintiff acknowledges that no transfer under the contract was ever *formally* demanded and that no ALA was ever imposed. Instead it relies on the doctrine of anticipatory breach, citing estimates of ALAs provided by Hancock. Plaintiff claims these estimates would have been misapplied or miscalculated by defendant in the event transfer was ordered by plaintiff.[14] Here the plaintiff relies on an analysis by Dr. Roger Ibbotson of the Yale University School of Management which takes issue with defendant's method of calculating the ALA. The Court finds it unnecessary to assess these conflicting methodologies because plaintiff's doctrine of anticipatory breach is flawed. Plaintiff continued to treat the contract as valid and subsisting after the estimates of ALA were made by Hancock. Where a party continues to treat a contract as valid and subsisting after the alleged repudiation, it may not rely on the anticipatory breach doctrine. *Strasbourger v. Leerburger*, 233 N.Y. 55, 59, 134 N.E. 834 (1922); *North Country Rocky Point, Inc. v. Lewyt–Patchogue Co.*, 60 A.D.2d 866, 401 N.Y.S.2d 258 (App.Div.), *appeal denied*, 44 N.Y.2d 643, 376 N.E.2d 936, 405 N.Y.S.2d 1027 (1978). *See Marvel Entertainment Group, Inc. v. ARP Films, Inc.*, 684 F.Supp. 818, 820–21 (S.D.N.Y.1988).

**6. Failure to Pay Dividends**

The plaintiff's claim that Hancock breached GAC 50 by failing to pay any dividends from 1971–1981 is based on Article V, Section 7, which reads as follows:

> This contract is a participating Contract. The Company shall annually ascertain and apportion any divisible surplus accruing under the contracts of this class.

The parties have stipulated that:

> Hancock's Board of Directors annually votes, in its "dividend vote," to apportion and pay or allow a distribution of surplus with respect to eligible group annuity contracts and votes therein to adopt formulas for determining the distribution of such surplus.

A.S.F. ¶ 16.

As required by state insurance law, Hancock, as a mutual life company, annually establishes dividend formulas and determines the amount of any dividend to be paid under its participating contracts and policies, including GAC 50. A.S.F. ¶ 28.

 In general, courts give directors broad discretion as to the determination of dividends and relief will only be given in the event of willful neglect or bad faith. *See Rhine v. New York Life Ins. Co.*, 273 N.Y. 1, 6 N.E.2d 74 (1936); *Kern v. John Hancock Mut. Life Ins. Co.*, 8 A.D.2d 256, 186 N.Y.S.2d 992 (App.Div. 1st Dep't 1959), *aff'd*, 8 N.Y.2d 833, 168 N.E.2d 532, 203 N.Y.S.2d 92 (1960).

 Exhibits 14–22 contained in Plaintiff's Exhibit Binder filed Mar. 23, 1990, the resolutions of the directors in the years in question, are evidence of no willful neglect. Defendant contends that its calculations came out against a dividend for the GAC 50 class of contractholders because the Contingency Account was not deemed to be large enough in relation to the risks under the liabilities of the contract. Winslow Aff. dated May 7, 1990 ¶¶ 2–5. Plaintiff's

---

**14.** The ALA adjustment under Article III, Section 9, was only to be made in the event an actual transfer of assets occurred (the rationale for such adjustment being that a transfer of assets would require a liquidation of long-term investments in the General Account). This provision defines the method of calculation of an ALA, not when it may or may not be calculable. *Cf. Police Pension Comm'n v. John Hancock Mut. Life Ins. Co.*, No. 84–3815 (E.D.Pa. July 8, 1985); Kaye Dep. at 83–89; McCarthy Dep. at 35–36; Raskin Dep. at 384.

conclusory assertion that dividends should have been paid because the "surplus funds were wholly unnecessary for Hancock's security," Pl.Mem. of Law in Opp. at 55, is insufficient to raise a genuine issue of material fact. *See Delaware & Hudson Ry. Co. v. Consolidated Rail Corp,* 902 F.2d 174, 178 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). Despite extended discovery there are no counter affidavits showing bad faith or neglect.

■ Under New York law "prima facie the apportionment of the divisible surplus by a mutual life insurance company must be deemed equitable," *Barnett v. Metropolitan Life Ins. Co.,* 258 A.D. 241, 245, 16 N.Y.S.2d 198, 202 (App.Div. 1st Dep't 1939), *aff'd,* 285 N.Y. 627, 33 N.E.2d 554 (1941), and plaintiff has a heavy burden to carry. *See Fidelity & Casualty Co. of New York v. Metropolitan Life Ins. Co.,* 42 Misc.2d 616, 248 N.Y.S.2d 559, 568 (N.Y.Sup.Ct.1963). Because the non-division of surplus affected all contracts of GAC 50's class and did not benefit Hancock (a mutual company); because the severe increase in interest rates in the late 1970's would have meant a significant diminution in the market value of GAC 50 funds in the General Account carried at book value, of which the Court takes judicial notice; and because plaintiff offers no evidence of neglect or bad faith, plaintiff has failed to demonstrate that a genuine issue of material fact exists as to this claim. Accordingly, defendant's motion for summary judgment is granted.

## II. *Common Law Claims*

### 1. Implied Covenant of Good Faith and Fair Dealing

Plaintiff argues that the totality of the circumstances surrounding Hancock's performance under GAC 50 demonstrates that Hancock has breached its covenant of good faith and fair dealing. Plaintiff's Mem. in Opp. at 57. Specifically, plaintiff objects to Hancock's termination of non-guaranteed benefits, failure to revalue rate tables for the pre–1968 annuities, refusal to permit rollover, assessment of risk charges, calculation of the ALA and failure to pay dividends, all of which relate to provisions of the GAC 50.

■ A covenant of good faith, however, cannot expand contract rights beyond the terms of the contract nor can a party violate that covenant when exercising its rights under the contract. *See VTR, Inc. v. Goodyear Tire & Rubber Co.,* 303 F.Supp. 773, 777–78 (S.D.N.Y.1969). *See also Keene Corp. v. Bogan,* No. 88 Civ. 0217, slip op. at 14, 1990 WL 1864 (S.D.N.Y. Jan. 11, 1990) (WESTLAW, Allfeds database) (citing *VTR, Inc.*). Good faith or lack thereof is a matter for the Court to decide. *Richard Short Oil Co. v. Texaco, Inc.,* 799 F.2d 415, 422 (8th Cir. 1986); Corbin on Contracts, § 654B at 924 (Supp.1989) The acts of defendant alleged by plaintiff since they are consonant with the contract's terms do not appear to amount to a breach of the implied duty of good faith. Plaintiff has not provided any facts showing defendant's acts were directed against plaintiff as opposed to acts carried out as ordinary corporate action.[15] Accordingly, summary judgment is granted on this issue.

There remain other bad faith claims of plaintiff relating to company-wide practices of Hancock which must be considered: Hancock's investment of General Account funds in its home office building; Hancock's segmentation of assets in its General Account in 1982; and Hancock's policy of imputing bond and mortgage yields to newly-acquired common stock holdings in allocating income in the early 1970's.

---

**15.** For over six years before the filing of this suit, Sperry received actual notice of the various components of the annual determinations made by Hancock including the directors' failure to declare any dividends, A.S.F. ¶¶ 31, 34, 49–52, Plaintiff's Admissions ¶¶ 119, 124, 129. There is no evidence of any complaint by plaintiff to the annual determinations. Under these circum-stances, the doctrine of laches bars any claims against Hancock on those grounds and indeed the six-year Statute of Limitations bars such claims. Sperry's argument that these annual determinations were of a summary nature is not an adequate excuse. If the determinations were summary, plaintiff could have asked for explanations.

■ Hancock's General Account into which Article I, Section 15 of GAC 50 required all Sperry's contributions be placed constituted the general corporate funds of Hancock. Absent some factual showing that a corporate investment decision regarding General Account funds was not made in a disinterested manner for the benefit of the company as a whole, which plaintiff's supporting papers do not make, plaintiff cannot challenge investments in corporate headquarters.[16] Accordingly, summary judgment is also granted on this issue.

As for segmentation, the parties have stipulated that in 1982 Hancock divided assets in its General Account into subaccounts, each having its own investment policy. A.S.F. ¶ 88. Thereafter, contracts in the subaccount including GAC 50 received investment income from assets in the so-called "Pension Participating Segment" but received no income from assets assigned to other lines of business such as guaranteed investment contracts in the "Pension Non–Participating Segment." Plaintiff claims that because in 1982 relatively more high-yield investments were assigned to the Pension Non–Participating Segment, GAC 50 was wrongfully deprived of investment income it would have received absent segmentation.

Finally, plaintiff objects to Hancock's policy from 1971–1977 of imputing to common stock investments made in a particular year the yields on Hancock's bond and mortgage investments made for that year in the first two years of the life of those common stock investments. A.S.F. ¶¶ 60, 63. This policy raised the "new money" rate for the General Account. *Id.* ¶ 61. Plaintiff claims that this policy penalized "old" contracts such as GAC 50 heavily weighted with older assets because the rate of return credited to these accounts was reduced in order to offset the additional investment income being imputed to the "new money" investments. McCarthy Aff. ¶ 9.

■ Relevant to both of these claims is the following stipulation by the parties:

> With respect to Hancock's General Account, Hancock has sole authority and discretion, in accordance with and as limited by applicable laws and regulations, to establish and execute investment policy and to allocate investment income, capital gains and losses and investment expenses to particular lines of business, classes of contracts and particular contracts.

A.S.F. ¶ 12. Plaintiff has not demonstrated any violation of this authority and discretion and thus has no grounds for objecting to Hancock's segmentation or imputation policies unless some applicable law or regulation was violated. Plaintiff argues that these policies resulted in GAC 50 being treated in a discriminatory fashion and thus violated New York Insurance Law § 4224(a)(1). Plaintiff's Mem. in Opp. at 65. That section provides:

> (a) No insurance company doing business in this state and no savings and insurance bank shall:
>
> (1) make or permit any unfair discrimination between *individuals of the same class* and of equal expectation of life, in the amount or payment or return of premiums, or rates charged for policies of life insurance or annuity contracts, or in the dividends or other benefits payable thereon, or in any of the terms and conditions thereof;

N.Y.Ins.Law § 4224(a)(1) (McKinney 1985) (emphasis added). This section, like its counterpart pertaining to health insurance, § 4224(b), plainly applies to discrimination among individual insureds. *See, e.g., Health Ins. Ass'n of Am. v. Corcoran*, 154 A.D.2d 61, 551 N.Y.S.2d 615 (App.Div.) (challenging determination by State Superintendent of Insurance that use of HIV test results in screening applicants for health insurance violated § 4224), *aff'd*, 76 N.Y.2d 995, 565 N.E.2d 1264, 564 N.Y.S.2d 713 (1990); *Silver v. Equitable Life Assurance Soc'y*, 563 N.Y.S.2d 78 (App.Div.1990) (alleging that exclusionary rider discrimi-

---

**16.** Massachusetts law permits an insurance company to invest its General Account assets in home office properties. Mass.Gen.L. ch. 175, § 66B (1987 & Supp.1991).

nated against individual with congenital mental retardation). There is no allegation that Hancock unfairly discriminated among individual Sperry retirees and thus the segmentation and imputation policies were within Hancock's "sole discretion" by agreement of the parties.

2. Breach of Fiduciary Duty

 Plaintiff asserts a claim for common law breach of fiduciary duty relating to Hancock's administration of GAC 50's General Account funds. Hancock argues that this claim is preempted by ERISA. ERISA's preemption provision, 29 U.S.C. § 1144, provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." The Second Circuit has observed:

> [L]aws that have been ruled preempted are those that provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee. Those that have not been preempted are laws of general application—often traditional exercises of state power or regulatory authority—whose effect on ERISA plans is incidental.

*See Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2d Cir.) (Connecticut escheat law not preempted), *cert. denied,* — U.S. —, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989). The Court ruled in its prior opinion that Hancock, as an insurer and issuer of a "guaranteed benefit policy" based on its General Account assets did not have a fiduciary duty under ERISA with respect to assets held in its General Account for GAC 50 and dismissed plaintiff's ERISA claim. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 722 F.Supp. 998 (S.D.N.Y.1989) (applying 29 U.S.C. § 1101(b)(2)(B)). Permitting plaintiff to as-

sert a common law breach of fiduciary duty claim against Hancock in this context poses no danger of creating a "patchwork scheme of regulation," *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11, 107 S.Ct. 2211, 2217, 96 L.Ed.2d 1 (1987), for employee benefit plans. *See Ventimiglia v. Gruntal & Co.*, No. 88 Civ. 1675, 1989 WL 251402 (S.D.N.Y. Nov. 1, 1989) (refusing to dismiss common law breach of fiduciary duty claim pleaded in the alternative to ERISA count but acknowledging that claim would fail if ERISA were later held to apply to the case). Such a claim is not preempted and may lie if there is evidence of a breach of fiduciary duty to the appropriate party.[17]

Plaintiff claims as a matter of case law that Hancock owed plaintiff a fiduciary duty, citing *Hartford Accident & Indem. Co. v. Michigan Mut. Ins. Co.*, 93 A.D.2d 337, 462 N.Y.S.2d 175 (App.Div. 1st Dep't 1983), *aff'd,* 61 N.Y.2d 569, 463 N.E.2d 608, 475 N.Y.S.2d 267 (1984). However, *Hartford Accident* refers to the fiduciary duty that exists "between an insurer and its assured." *Id.,* 462 N.Y.S.2d at 178. Because, as stipulated, what Hancock guaranteed was the payment of an annuity to covered employees for life (at least for any employees retiring prior to the 1977 amendment), it is clear that Sperry retirees are Hancock's only "assureds." A.S.F. ¶¶ 10, 32, 39, 80.[18] There is no showing that Hancock has violated a fiduciary duty to those employees or to any employees who retired thereafter insofar as those employees were guaranteed benefits. To the extent retirees under the Plan were required to look to the Plan assets and not to Hancock for payment of benefits, they were not Hancock's assureds. Plaintiff as trustee of the Sperry Plan is not an "assured" as to whom a common law fiduciary duty was owed by Hancock and there is no evi-

---

17. Hancock would have fiduciary duties under ERISA with respect to funds not held in its General Account but held in its separate account which did not guarantee benefits but that claim is not made in this litigation.

18. Article V, Section 1 of GAC 50 provides: The Company shall issue to the Retirement Committee, for delivery *to each employee cov-*

*ered hereunder,* an individual Certificate containing in substance a statement of the benefits to which the employee is entitled under this Contract and stating the name of the beneficiary to whom any death benefit shall be payable.
(emphasis added). These certificates are in the nature of guarantees.

dence showing the non-assured beneficiaries were damaged. Accordingly, this claim of plaintiff is dismissed.

### 3. Unjust Enrichment

 Plaintiff also asserts a claim for unjust enrichment. Insofar as this claim is based on the failure to permit rollover and the assessment of risk charges on funds accumulated by reason of Hancock's termination of non-guaranteed benefits, refusal to permit rollover and its refusal to revalue rate tables for pre–1968 annuities, the claim is controlled by the express terms of the contract. Bargained-for benefits cannot be deemed to unjustly enrich a contracting party. *Cf. City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir.1988) (quasi-contractual relief unavailable where an express contract covers the subject matter). Accordingly, plaintiff's claim for unjust enrichment is denied and defendant's motion for summary judgment dismissing that claim is granted.

### CONCLUSION

Defendant's motion for summary judgment dismissing plaintiff's contract and common law claims is granted. Plaintiff's complaint now having been dismissed in its entirety, Hancock's counterclaims and its third-party complaint are dismissed as moot. This case is hereby ordered closed.

IT IS SO ORDERED.