JOHN HANCOCK MUTUAL LIFE INSURANCE CO.
*v.* HARRIS TRUST AND SAVINGS BANK, AS
TRUSTEE OF THE SPERRY MASTER
RETIREMENT TRUST NO. 2

No. 92–1074. Argued October 12, 1993—Decided December 13, 1993

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, STEVENS, SCALIA, and SOUTER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which O'CONNOR and KENNEDY, JJ., joined, *post*, p. 111.

*Howard G. Kristol* argued the cause for petitioner. With him on the briefs were *Robert M. Peak, Rosalie A. Hailey,* and *Richard J. J. Scarola.*

*Christopher J. Wright* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Bryson, Acting Deputy Solicitor General Kneedler, Judith E. Kramer, Allen H. Feldman, Nathaniel I. Spiller,* and *Elizabeth Hopkins.*

*Lawrence Kill* argued the cause for respondent. With him on the brief was *John B. Berringer.**

JUSTICE GINSBURG delivered the opinion of the Court.

This case presents an issue of statutory construction—whether the fiduciary standards stated in the Employee Retirement Income Security Act of 1974 (ERISA) govern an insurance company's conduct in relation to certain annuity contracts. Fiduciary status under ERISA generally attends the management of "plan assets." The statute, however, contains no comprehensive definition of "plan assets." Our task in this case is to determine the bounds of a statutory exclusion from "plan asset" categorization, an exclusion Congress prescribed for "guaranteed benefit polic[ies]."

The question before us arises in the context of a contract between defendant-petitioner John Hancock Mutual Life Insurance Company (Hancock) and plaintiff-respondent Harris Trust and Savings Bank (Harris), current trustee of a Sperry Rand Corporation Retirement Plan.[1] Pursuant to its con-

---

*Briefs of *amici curiae* urging reversal were filed for the State of New York et al. by *Robert Abrams,* Attorney General of New York, and *Jerry Boone,* Solicitor General, and *Scott Harshbarger,* Attorney General of Massachusetts; for the American Council of Life Insurance by *James F. Jorden, Stephen H. Goldberg, Perry Ian Cone, Waldemar J. Pflepsen, Jr., Richard E. Barnsback, Stephen W. Kraus,* and *Phillip E. Stano;* and for the Life Insurance Council of New York by *Theodore R. Groom, Stephen M. Saxon, William F. Hanrahan, William J. Flanagan,* and *Raymond A. D'Amico.*

Briefs of *amici curiae* urging affirmance were filed for Certain United States Senators and Representatives by *Howard M. Metzenbaum, pro se;* for the American Association of Retired Persons et al. by *Cathy Ventrell-Monsees, Joan S. Wise, Mary Ellen Signorille,* and *Edgar Pauk;* and for the Western Conference of Teamsters Pension Trust Fund by *William H. Song, Brigid Carroll Anderson,* and *Timothy St. Clair Smith.*

[1] Sperry Rand Corporation has undergone a number of changes in name and corporate form since 1941, when the contract with Hancock was initially made; for convenience, we use in this opinion only the employer-corporation's original name, Sperry.

tract with Harris, Hancock receives deposits from the Sperry Plan. Harris asserts that Hancock is managing "plan assets," and therefore bears fiduciary responsibility. Hancock maintains that its undertaking fits within the statutory exclusion for "guaranteed benefit polic[ies]." "Guaranteed benefit policy" is not a trade term originating in the insurance industry; it is a statutory invention placed in ERISA and there defined as an insurance policy or contract that "provides for benefits the amount of which is guaranteed by the insurer." 88 Stat. 875, 29 U. S. C. § 1101(b)(2)(B).

The contract in suit is of a kind known in the trade as a "deposit administration contract" or "participating group annuity."[2] Under a contract of this type, deposits to secure retiree benefits are not immediately applied to the purchase of annuities; instead, the deposits are commingled with the insurer's general corporate assets, and deposit account balances reflect the insurer's overall investment experience. During the life of the contract, however, amounts credited to the deposit account may be converted into a stream of guaranteed benefits for individual retirees.

We granted certiorari, 507 U. S. 983 (1993), to resolve a split among Courts of Appeals regarding the applicability of the guaranteed benefit policy exclusion to annuity contracts of the kind just described. The Second Circuit in the case we review held that the guaranteed benefit policy exclusion did not cover funds administered by Hancock that bear no fixed rate of return and have not yet been converted into guaranteed benefits. 970 F. 2d 1138, 1143–1144 (1992). We agree with the Second Circuit that ERISA's fiduciary obligations bind Hancock in its management of such funds, and accordingly affirm that court's judgment.

_____

[2] For descriptions of these contracts, see D. McGill & D. Grubbs, Fundamentals of Private Pensions 551–564 (6th ed. 1989) (hereinafter McGill & Grubbs); see also Goldberg & Altman, The Case for the Nonapplication of ERISA to Insurers' General Account Assets, 21 Tort & Ins. L. J. 475, 478–482 (1986) (hereinafter Goldberg & Altman).

## I

The parties refer to the contract at issue as Group Annuity Contract No. 50 (GAC 50). Initially, GAC 50 was a simple deferred annuity contract under which Sperry purchased from Hancock individual deferred annuities, at rates fixed by the contract, for employees eligible under the Sperry Retirement Plan.

Since its origination in 1941, however, GAC 50 has been transformed by amendments. By the time this litigation commenced, the contract included the following features. Assets and liabilities under GAC 50 were recorded (for bookkeeping purposes) in two accounts—the "Pension Administration Fund" recorded assets, and the "Liabilities of the Fund," liabilities. GAC 50 assets were not segregated, however; they were part of Hancock's pool of corporate funds, or general account, out of which Hancock pays its costs of operation and satisfies its obligations to policyholders and other creditors. See Agreed Statement of Facts ¶¶ 11–19, App. 85–86; Brief for Petitioner 7–9; see also McGill & Grubbs 492 (describing general accounts); id., at 552 (describing asset allocation under deposit administration contracts). Hancock agreed to allocate to GAC 50's Pension Administration Fund a pro rata portion of the investment gains and losses attributable to Hancock's general account assets, Agreed Statement of Facts ¶ 11, App. 85, and also guaranteed that the Pension Administration Fund would not fall below its January 1, 1968, level, Agreed Statement of Facts ¶ 27, id., at 88.

GAC 50 provided for conversion of the Pension Administration Fund into retirement benefits for Sperry employees in this way. Upon request of the Sperry Plan Administrator, Hancock would guarantee full payment of all benefits to which a designated Sperry retiree was entitled; attendant liability would then be recorded by adding an amount, set by

Hancock, to the Liabilities of the Fund.[3]   In the event that the added liability caused GAC 50's "Minimum Operating Level"—the Liabilities of the Fund plus a contingency cushion of five percent—to exceed the amount accumulated in the Pension Administration Fund, the "active" or "accumulation" phase of the contract would terminate automatically.   In that event, Hancock would purchase annuities at rates stated in the contract to cover all benefits previously guaranteed by Hancock under GAC 50, and the contract itself would convert back to a simple deferred annuity contract.   Agreed Statement of Facts ¶¶ 33, 36–37, 42, *id.*, at 89–91.

As GAC 50 was administered, amounts recorded in the Pension Administration Fund were used to provide retirement benefits to Sperry employees in other ways.   In this connection, the parties use the term "free funds" to describe the excess in the Pension Administration Fund over the Minimum Operating Level (105 percent of the amount needed to provide guaranteed benefits).   In 1977, Sperry Plan trustee Harris obtained the right to direct Hancock to use the free funds to pay "nonguaranteed benefits" to retirees.   These benefits were provided monthly on a pay-as-you-go basis; they were nonguaranteed in the sense that Hancock was obligated to make payments only out of free funds, *i. e.*, only when the balance in the Pension Administration Fund exceeded the Minimum Operating Level.

Additionally, in 1979 and again in 1981, Hancock permitted Harris to transfer portions of the free funds pursuant to "rollover" procedures.   Agreed Statement of Facts ¶ 78, *id.*, at 96.   Finally, in 1988, a contract amendment allowed Harris to transfer over $50 million from the Pension Administration Fund without triggering the contract's "asset liquidation

---

[3] This liability calculation established, in effect, the price for Hancock's guarantee of a specified benefit stream.   The liability associated with a given benefit entitlement was to be calculated using rates that, since 1972, could be altered by Hancock.   Agreed Statement of Facts ¶ 39, App. 90.

adjustment," a mechanism for converting the book value of the transferred assets to market value.

While Harris in fact used these various methods to effect withdrawals from the Pension Administration Fund, Hancock maintains that only the original method—conversion of the Pension Administration Fund into guaranteed benefits—is currently within the scope of Harris' contract rights. In May 1982, Hancock gave notice that it would no longer make nonguaranteed benefit payments. Agreed Statement of Facts ¶¶ 82–87, *id.*, at 97–98. And since 1981 Hancock has refused all requests by Harris to make transfers using "rollover" procedures. Agreed Statement of Facts ¶ 79, *id.*, at 96.

Harris last exercised its right to convert Pension Administration Fund accumulations into guaranteed benefits in 1977. Agreed Statement of Facts ¶ 81, *id.*, at 97. Harris contends, and Hancock denies, that the conversion price has been inflated by incorporation of artificially low interest rate assumptions.

One means remains by which Harris may gain access to GAC 50's free funds. Harris can demand transfer of those funds in their entirety out of the Pension Administration Fund. Harris has not taken that course because it entails an asset liquidation adjustment Harris regards as undervaluing the plan's share of Hancock's general account. In sum, nothing was removed from the Pension Administration Fund or converted into guaranteed benefits between June 1982 and 1988. During that period the free funds increased dramatically as a result of Hancock's continuing positive investment experience, the allocation of a portion of that experience to the Pension Administration Fund, and the absence of any offsetting increase in the Liabilities of the Fund for additional guaranteed benefits.

Harris commenced this action in July 1983, contending, *inter alia*, that Hancock breached its fiduciary obligations under ERISA by denying Harris any realistic means to make

use of GAC 50's free funds. Hancock responded that ERISA's fiduciary standards do not apply because GAC 50, in its entirety, "provides for benefits the amount of which is guaranteed by the insurer" within the meaning of the "guaranteed benefit policy" exclusion accorded by 29 U.S.C. § 1101(b)(2)(B).

In September 1989, the District Court granted Hancock's motion for summary judgment on Harris' ERISA claims, holding that Hancock was not an ERISA fiduciary with respect to any portion of GAC 50. 722 F. Supp. 998 (SDNY 1989). The District Court thereafter dismissed Harris' remaining contract and tort claims. See 767 F. Supp. 1269 (1991). On appeal, the Second Circuit reversed in part. The Court of Appeals determined that although Hancock "provides guarantees with respect to one portion of the benefits derived from [GAC 50], it does not do so at all times with respect to all the benefits derived from the other, or free funds, portion" of the contract. 970 F. 2d, at 1143. The free funds "were not converted to fixed, guaranteed obligations but instead were subject to fluctuation based on the insurer's investment performance." Id., at 1144. With respect to those free funds, the Second Circuit concluded, Hancock "provides no guarantee of benefit payments or fixed rates of return." Ibid. The Court of Appeals accordingly ruled that ERISA's fiduciary standards govern Hancock's management of the free funds, and it instructed the District Court to determine whether those standards had been satisfied. Ibid.

## II

### A

Is Hancock a fiduciary with respect to any of the funds it administers under GAC 50? To answer that question, we examine first the language of the governing statute, guided not by "a single sentence or member of a sentence, but look[ing] to the provisions of the whole law, and to its object

and policy." *Pilot Life Ins. Co.* v. *Dedeaux,* 481 U. S. 41, 51 (1987), quoting *Kelly* v. *Robinson,* 479 U. S. 36, 43 (1986) (internal quotation marks omitted). The obligations of an ERISA fiduciary are described in 29 U. S. C. § 1104(a)(1): A fiduciary must discharge its duties with respect to a plan

"solely in the interest of the participants and beneficiaries and—
"(A) for the exclusive purpose of:
"(i) providing benefits to participants and their beneficiaries . . . ."

A person is a fiduciary with respect to an employee benefit plan

"to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises *any authority or control respecting management or disposition of its assets* . . . ." 29 U. S. C. § 1002(21)(A) (emphasis added).

The "assets" of a plan are undefined except by exclusion in § 1101(b)(2), which reads in relevant part:

"In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer."

A "guaranteed benefit policy," in turn, is defined as

"an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer. Such term includes any surplus in a separate account, but excludes any other portion of a separate account." § 1101(b)(2)(B).[4]

---

[4] As noted by Goldberg and Altman, the term "guaranteed benefit contract . . . has never been a part of the insurance industry lexicon." Goldberg & Altman 482. ERISA itself must thus supply the term's meaning.

Although these provisions are not mellifluous, read as a whole their import is reasonably clear. To help fulfill ERISA's broadly protective purposes,[5] Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive. See 29 U. S. C. § 1002(21)(A) (defining as a fiduciary any person who "exercises any authority or control respecting management or disposition of [a plan's] assets"); H. R. Conf. Rep. No. 93–1280, p. 296 (1974) (the "fiduciary responsibility rules generally apply to all employee benefit plans . . . in or affecting interstate commerce"). The guaranteed benefit policy exclusion from ERISA's fiduciary regime[6] is markedly confined: The deposits over which Hancock is exercising authority or control under GAC 50 must have been obtained "solely" by reason of the issuance of "an insurance policy or contract" that provides for benefits "the amount of which is guaranteed," and even then it is only "to the extent" that GAC 50 provides for such benefits that the § 1101(b)(2)(B) exemption applies.

In contrast, elsewhere in the statute Congress spoke without qualification. For example, Congress exempted from the definition of plan assets *"any security"* issued to a plan by a registered investment company. 29 U. S. C. § 1101(b)(1) (emphasis added). Similarly, Congress exempted *"any assets* of . . . an insurance company or *any assets* of a plan which are held by . . . an insurance company" from the re-

---

[5] See, *e. g., Massachusetts* v. *Morash,* 490 U. S. 107, 112–113 (1989); *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724, 732 (1985). The statute's statement of purpose observes that "the continued well-being and security of millions of employees and their dependents are directly affected by [employee benefit plans]" and declares it "desirable . . . that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans . . . ." 29 U. S. C. § 1001(a).

[6] Section 1101(b) also provides an exclusion for assets held by "an investment company registered under the Investment Company Act of 1940." 29 U. S. C. § 1101(b)(1).

quirement that plan assets be held in trust. § 1103(b)(2) (emphasis added). Notably, the guaranteed benefit policy exemption is not available to "any" insurance contract that provides for guaranteed benefits but only "to the extent that" the contract does so. See Comment, Insurers Beware: General Account Activities May Subject Insurance Companies to ERISA's Fiduciary Obligations, 88 Nw. U. L. Rev. 803, 833–834 (1994). Thus, even were we not inclined, generally, to tight reading of exemptions from comprehensive schemes of this kind, see, e. g., Commissioner v. Clark, 489 U. S. 726, 739–740 (1989) (when a general policy is qualified by an exception, the Court "usually read[s] the exception narrowly in order to preserve the primary operation of the [policy]"), A. H. Phillips, Inc. v. Walling, 324 U. S. 490, 493 (1945) (cautioning against extending exemptions "to other than those plainly and unmistakably within its terms"), Congress has specifically instructed, by the words of limitation it used, that we closely contain the guaranteed benefit policy exclusion.

## B

Hancock, joined by some *amici,* raises a threshold objection. ERISA's fiduciary standards cannot govern an insurer's administration of general account contracts, Hancock asserts, for that would pose irreconcilable conflicts between state and federal regulatory regimes. ERISA requires fiduciaries to act "*solely* in the interest of the participants and beneficiaries and . . . for the *exclusive purpose* of . . . providing benefits to participants and their beneficiaries." 29 U. S. C. § 1104(a) (emphasis added). State law, however, requires an insurer, in managing general account assets, "to consider the interests of all of its contractholders, creditors and shareholders," and to "maintain equity among its various constituencies." Goldberg & Altman 477.[7] To head off

---

[7] See, e. g., N. Y. Ins. Law § 4224(a)(1) (McKinney 1985) (prohibiting unfair discrimination between contractholders); see also Mack Boring & Parts v. Meeker Sharkey Moffitt, Actuarial Consultants of New Jersey,

conflicts, Hancock contends, ERISA must yield, because Congress reserved to the States primary responsibility for regulation of the insurance industry. We are satisfied that Congress did not order the unqualified deferral to state law that Hancock both advocates and attributes to the federal lawmakers. Instead, we hold, ERISA leaves room for complementary or dual federal and state regulation, and calls for federal supremacy when the two regimes cannot be harmonized or accommodated.

To support its contention, Hancock refers first to the McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U. S. C. § 1011 *et seq.*, which provides:

> "The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation . . . of such business." 15 U. S. C. § 1012(a).
>
> "No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance . . . ." § 1012(b).

But as the United States points out, "ERISA, both in general and in the guaranteed benefit policy provision in particular, obviously and specifically relates to the business of insurance." Brief for United States as *Amicus Curiae* 23, n. 13.[8] Thus, the McCarran-Ferguson Act does not surrender regulation exclusively to the States so as to preclude the application of ERISA to an insurer's actions under a general account contract. See *ibid.*

---

930 F. 2d 267, 275, n. 17 (CA3 1991) (noting state regulations requiring insurers to treat all contractholders fairly and equitably). See generally McGill & Grubbs 492–494.

[8] We called attention to the "deliberately expansive" character of ERISA's preemption provisions in *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S. 41, 45–46 (1987).

More problematic are two clauses in ERISA itself, one broadly providing for preemption of state law, the other preserving, or saving from preemption, state laws regulating insurance. ERISA's encompassing preemption clause directs that the statute "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U. S. C. § 1144(a). The "saving clause," however, instructs that ERISA "shall [not] be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." § 1144(b)(2)(A). State laws concerning an insurer's management of general account assets can "relate to [an] employee benefit plan" and thus fall under the preemption clause, but they are also, in the words of the saving clause, laws "which regulat[e] insurance."

ERISA's preemption and saving clauses " 'are not a model of legislative drafting,' " *Pilot Life*, 481 U. S., at 46, quoting *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724, 739 (1985), and the legislative history of these provisions is sparse, see *id.*, at 745–746. In accord with the District Court in this case, however, see 722 F. Supp., at 1003–1004, we discern no solid basis for believing that Congress, when it designed ERISA, intended fundamentally to alter traditional preemption analysis. State law governing insurance generally is not displaced, but "where [that] law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress," federal preemption occurs. *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 248 (1984).[9]

We note in this regard that even Hancock does not ascribe a discrete office to the "saving clause" but instead asserts that the clause "reaffirm[s] the McCarran-Ferguson Act's res-

---

[9] No decision of this Court has applied the saving clause to supersede a provision of ERISA itself. See, *e. g.*, *FMC Corp.* v. *Holliday*, 498 U. S. 52, 61 (1990) (ERISA-covered benefit plans that purchase insurance policies are governed by both ERISA and state law; self-insured plans are subject only to ERISA); *Metropolitan Life*, 471 U. S., at 746–747 (same).

ervation of the business of insurance to the States." Brief for Petitioner 31; see *Metropolitan Life*, 471 U. S., at 744, n. 21 (saving clause "appears to have been designed to preserve the McCarran-Ferguson Act's reservation of the business of insurance to the States"; saving clause and McCarran-Ferguson Act "serve the same federal policy and utilize similar language"). As the United States recognizes, "dual regulation under ERISA and state law is not an impossibility[;] [m]any requirements are complementary, and in the case of a direct conflict, federal supremacy principles require that state law yield." Brief for United States as *Amicus Curiae* 23, n. 13.[10]

In resisting the argument that, with respect to general account contracts, state law, not federal law, is preemptive, we are mindful that Congress had before it, but failed to pass, just such a scheme. The Senate's proposed version of ERISA would have excluded all general account assets from the reach of the fiduciary rules.[11] Instead of enacting the

---

[10] See *Chicago Bd. Options Exchange, Inc.* v. *Connecticut General Life Ins. Co.*, 713 F. 2d 254, 260 (CA7 1983) ("That ERISA does not relieve insurance companies of the onus of state regulation does not mean that Congress intended ERISA not to apply to insurance companies. Had that been Congress' intent . . . ERISA would have directly stated that it was pre-empted by state insurance laws."); 722 F. Supp. 998, 1004 (SDNY 1989) ("dual regulation comports with the language of the preemption and saving clauses, . . . which save certain state statutes from preemption, but which also assume that ERISA applies ab initio").

[11] The Senate version of ERISA originally defined an "employee benefit fund" to exclude "premium[s], subscription charges, or deposits received and retained by an insurance carrier . . . except for any separate account established or maintained by an insurance carrier," and defined a fiduciary as "any person who exercises any power of control, management, or disposition with respect to any moneys or other property of any employee benefit fund . . . ." See S. 4, 93d Cong., 1st Sess., §§ 502(17)(B), (25), reprinted in Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 94th Cong., 2d Sess., Legislative History of ERISA 147, 150 (Comm. Print 1976). After an amendment (Amdt. No. 496, Sept. 17, 1973), the provision regarding "Fiduciary Standards" was streamlined to exclude

Senate draft, which would indeed have "settled [insurance industry] expectations," see *post*, at 111, Congress adopted an exemption containing words of limitation. We are directed by those words, and not by the discarded draft. Cf. *Russello* v. *United States*, 464 U. S. 16, 23–24 (1983) (when Congress deletes limiting language, "it may be presumed that the limitation was not intended").[12]

Persuaded that a plan's deposits are not shielded from the reach of ERISA's fiduciary prescriptions solely by virtue of their placement in an insurer's general account, we proceed to the question the Second Circuit decided: Is Hancock an ERISA fiduciary with respect to the free funds it holds under GAC 50?

### C·

To determine GAC 50's qualification for ERISA's guaranteed benefit policy exclusion, we follow the Seventh Circuit's lead, see *Peoria Union Stock Yards Co. Retirement Plan* v. *Penn Mutual Life Ins. Co.*, 698 F. 2d 320, 324–327 (1983), and seek guidance from this Court's decisions construing the insurance policy exemption ordered in the Securities Act of 1933. See 48 Stat. 75, 15 U. S. C. § 77c(a)(8) (excluding from the reach of the Securities Act "[a]ny insurance or endowment policy or annuity contract or optional annuity contract").

In *SEC* v. *Variable Annuity Life Ins. Co. of America*, 359 U. S. 65 (1959), we observed that "the concept of 'insurance' involves some investment risk-taking on the part of the company," and "a guarantee that at least some fraction of the

---

"funds held by an insurance carrier unless that carrier holds funds in a separate account." S. 4, Amdt. No. 496, § 511, *id.*, at 1451.

[12] Congress' failure to pass a blanket exclusion for funds held by an insurer in its general account also counsels against reading the second sentence of the guaranteed benefit policy exception, 29 U. S. C. § 1101(b)(2)(B), which includes all *separate account* assets within the definition of "plan assets," as implying that assets held in an insurer's general account are necessarily *not* plan assets.

benefits will be payable in fixed amounts." *Id.*, at 71. A variable annuity, we held, is not an "insurance policy" within the meaning of the statutory exemption because the contract's entire *investment* risk remains with the policyholder inasmuch as "benefit payments vary with the success of the [insurer's] investment policy," *id.*, at 69, and may be "greater or less, depending on the wisdom of [that] policy," *id.*, at 70.

Thereafter, in *SEC* v. *United Benefit Life Ins. Co.*, 387 U. S. 202 (1967), we held that an annuity contract could be considered a nonexempt investment contract during the contract's accumulation phase, and an exempt insurance contract once contractually guaranteed fixed payouts began. Under the contract there at issue, the policyholder paid fixed monthly premiums which the issuer placed in a fund—called the "Flexible Fund"—invested by the issuer primarily in common stocks. At contract maturity the policyholder could either withdraw the cash value of his proportionate share of the fund (which the issuer guaranteed would not fall below a specified value), or convert to a fixed-benefit annuity, with payment amounts determined by the cash value of the policy. During the accumulation phase, the fund from which the policyholder would ultimately receive benefits fluctuated in value according to the insurer's investment results; because the "insurer promises to serve as an investment agency and allow the policyholder to share in its investment experience," *id.*, at 208, this phase of the contract was serving primarily an investment, rather than an insurance, function, *ibid.*

The same approach—division of the contract into its component parts and examination of risk allocation in each component—appears well suited to the matter at hand because ERISA instructs that the § 1101(b)(2)(B) exemption applies only "*to the extent that*" a policy or contract provides for "benefits *the amount of which is guaranteed.*" Analyzing GAC 50 this way, we find that the contract fits the statutory exclusion only in part.

This much is not in dispute. During the contract's active, accumulation phase, any benefits payable by Hancock for which entries actually have been made in the Liabilities of the Fund fit squarely within the "guaranteed" category. Furthermore, if the active phase of the contract were to end, all benefits thereafter payable under the contract would be guaranteed in amount. To this extent also, GAC 50 "provides for benefits the amount of which is guaranteed."

We turn, then, to the nub of the controversy, Hancock's responsibility for administration of the free funds during GAC 50's active phase. Between 1977 and 1982, we note first, GAC 50 furnished retirement benefits expressly called "nonguaranteed"; those benefits, it is undisputed, entailed no "amount . . . guaranteed by the insurer." 29 U. S. C. § 1101(b)(2)(B); see *supra*, at 92. To that extent, GAC 50 does not fall within the statutory exemption. But the nonguaranteed benefit option is not the only misfit.

GAC 50, in key respects, is similar to the Flexible Fund contract examined in *United Benefit*. In that case, as in this one, the contract's aggregate value depended upon the insurer's success as an investment manager. Under both contracts, until the occurrence of a triggering event—contract maturity in the Flexible Fund case, Harris' exercise of its conversion option in the case of GAC 50—the investment risk is borne primarily by the contractholder. Confronting a contract bearing similar features, the Seventh Circuit stated:

> "The pension trustees did not buy an insurance contract with a fixed payout; they turned over the assets of the pension plan to [the insurer] to manage with full investment discretion, subject only to a modest income guaranty. If the pension plan had hired an investment advisor and given him authority to buy and sell securities at his discretion for the plan's account, the advisor would be a fiduciary within the meaning of [ERISA], and that is essentially what the trustees did during the accumula-

tion phase of th[is] contract . . . ." *Peoria Union*, 698 F. 2d, at 327.

In the Second Circuit's words, "[t]o the extent that [Hancock] engages in the discretionary management of assets attributable to that phase of the contract which provides no guarantee of benefit payments or fixed rates of return, it seems to us that [Hancock] should be subject to fiduciary responsibility." 970 F. 2d, at 1144.

Hancock urges that to the full extent of the free funds— and hence, to the full extent of the contract—GAC 50 "provides for" benefits the amount of which is guaranteed, inasmuch as "Harris Trust . . . has the right . . . to use any 'free funds' to purchase future guaranteed benefits under the contract, in addition to benefits previously guaranteed." Brief for Petitioner 26; see also *Mack Boring & Parts* v. *Meeker Sharkey Moffitt, Actuarial Consultants of New Jersey*, 930 F. 2d 267, 273 (CA3 1991) (statute's use of phrase "provides for" does not require that the benefits contracted for be delivered immediately; it is enough that the contract provides for guaranteed benefits "at some finite point in the future").

Logically pursued, Hancock's reading of the statute would exempt from ERISA's fiduciary regime any contract, in its entirety, so long as the funds held thereunder could be used at some point in the future to purchase some amount of guaranteed benefits.[13] But Congress did not say a contract is

---

[13] This argument resembles one rejected in *SEC* v. *United Benefit Life Ins. Co.*, 387 U. S. 202 (1967). In *United Benefit*, the policyholder was protected somewhat against fluctuations in the value of the contract fund through a promise that the cash value of the contract would not fall below the aggregate amount of premiums deposited with the insurer. *Id.*, at 205, 208, n. 10. We held that although this "guarantee of cash value based on net premiums reduces substantially the investment risk of the contract holder, the assumption of an investment risk cannot by itself create an insurance provision under the federal definition. The basic difference between a contract which to some degree is insured and a contract of insurance must be recognized." *Id.*, at 211 (citation omitted).

exempt "if" it provides for guaranteed benefits; it said a contract is exempt only *"to the extent"* it so provides. Using these words of limitation, Congress apparently recognized that contracts may provide to *some* extent for something other than guaranteed benefits, and expressly declared the exemption unavailable to that extent.

Tellingly with respect to GAC 50, the Pension Administration Fund is guaranteed only against a decline below its January 1, 1968, level. See *supra,* at 91. Harris thus bears a substantial portion of the risk as to fluctuations in the free funds, and there is not even the "modest income guaranty" the Seventh Circuit found insufficient in *Peoria Union.* 698 F. 2d, at 327. Furthermore, Hancock has the authority to set the price at which free funds are convertible into guaranteed benefits. See *supra,* at 92, n. 3. In combination, these features provide no genuine guarantee of the amount of benefits that plan participants will receive in the future.

It is true but irrelevant, Hancock pleads, that GAC 50 provides no guaranteed return to the plan, for ERISA uniformly uses the word "benefits" to refer exclusively to payments to plan participants or beneficiaries, not payments to plans. Brief for Petitioner 25; see also *Mack Boring,* 930 F. 2d, at 273 ("benefits" refers only to payments to participants or beneficiaries; payments to plan sponsors can be variable without defeating guaranteed benefit exclusion); Goldberg & Altman 482. This confinement of the word "benefits," however, perfectly fits the tight compass of the exclusion. A contract component that provides for something other than guaranteed payments to plan participants or beneficiaries— *e. g.,* a guaranteed return to the plan—does not, without more, provide for guaranteed *benefits* and thus does not fall within the statutory exclusion. Moreover, the guaranteed benefit policy exclusion requires a guarantee of the *amount* of benefits to be provided; with no guaranteed investment return to the plan, and no guarantee regarding conversion price, plan participants are undeniably at risk inasmuch as

the future amount of benefits—payments to participants and beneficiaries—attributable to the free funds can fall to zero. But see *post*, at 117, n. 4 (contending that the *plan's* guarantee renders immaterial the absence of a guarantee by the *insurer*). A contract of that order does not meet the statutory prescription.

In sum, we hold that to determine whether a contract qualifies as a guaranteed benefit policy, each component of the contract bears examination. A component fits within the guaranteed benefit policy exclusion only if it allocates investment risk to the insurer. Such an allocation is present when the insurer provides a genuine guarantee of an aggregate amount of benefits payable to retirement plan participants and their beneficiaries. As to a contract's "free funds"—funds in excess of those that have been converted into guaranteed benefits—these indicators are key: the insurer's guarantee of a reasonable rate of return on those funds and the provision of a mechanism to convert the funds into guaranteed benefits at rates set by the contract. While another contract, with a different mix of features, might satisfy these requirements, GAC 50 does not. Indeed, Hancock provided no real guarantee that benefits in any amount would be payable from the free funds. We therefore conclude, as did the Second Circuit, that the free funds are "plan assets," and that Hancock's actions in regard to their management and disposition must be judged against ERISA's fiduciary standards.

### III

One other contention pressed by Hancock and *amici* deserves consideration. Hancock, supported by the United States, asserts that the Department of Labor has adhered consistently to the view that ERISA's fiduciary obligations do not apply in relation to assets held by an insurer in its

general account under contracts like GAC 50.[14]  Hancock urges us to follow this view based on "'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'"  Brief for Petitioner 39, quoting *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944); see also *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843–844 (1984).

Hancock and the United States place primary reliance on an early interpretive bulletin in which the Department of Labor stated:

> "If an insurance company issues a contract or policy of insurance to a plan and places the consideration for such contract or policy in its general asset account, the assets in such account shall not be considered to be plan assets. Therefore, a subsequent transaction involving the general asset account between a party in interest and the insurance company will not, solely because the plan has been issued such a contract or policy of insurance, be a prohibited transaction."  Interpretive Bulletin 75–2, 40 Fed. Reg. 31598 (1975), 29 CFR § 2509.75–2(b) (1992).

If this passage squarely addressed the question we confront, namely, whether ERISA's fiduciary standards apply to assets held under participating annuity contracts like GAC 50, we would indeed have a clear statement of the Department's view on the matter at issue.  But, as the second sentence of the quoted passage shows, the question addressed in Interpretive Bulletin 75–2 was "whether a party in interest has engaged in a prohibited transaction [under 29 U. S. C. § 1106] with an employee benefit plan."  § 2509.75–2.[15]  The De-

---

[14] The Department of Labor shares enforcement responsibility for ERISA with the Department of the Treasury.  See 29 U. S. C. § 1204(a).

[15] The subsection title for the interpretation, published in the Code of Federal Regulations, is "Interpretive bulletin relating to prohibited transactions."

partment did not mention, let alone elaborate on, any grounding for Interpretive Bulletin 75–2 in § 1101's guaranteed benefit policy exemption, nor did the Bulletin speak of the application of its pronouncement, if any, to ERISA's fiduciary duty prescriptions.

The Department asserts the absence of any textual basis for the view, adopted by the Second Circuit, that "certain assets [can be considered] plan assets for general fiduciary duty purposes but not for prohibited transaction purposes," 970 F. 2d, at 1145, and, accordingly, no reason to suppose that Interpretive Bulletin 75–2's statement regarding plan assets would not apply in both contexts. See Brief for United States as *Amicus Curiae* 26–27. Nothing in Interpretive Bulletin 75–2 or 29 CFR § 2509.75–2 (1992), however, sets forth that position, or otherwise alerts the reader that more than the prohibited transaction exemption was then subject to the Department's scrutiny.[16] Had the Department intended Interpretive Bulletin 75–2 to apply to the guaranteed benefit policy exclusion, it would have had to explain how an unqualified exclusion for an insurer's general asset account can be reconciled with Congress' choice of a more limited ("to the extent that") formulation. Its silence in that regard is an additional indication that the 1975 pronouncement did not originally have the scope the Department now attributes to it.[17]

---

[16] It is noteworthy that the Secretary of Labor has express authority to grant exemptions from the rules regarding prohibited transactions, but not from § 1104's fiduciary duty provisions. See 29 U. S. C. § 1108.

[17] After a lengthy rulemaking proceeding, the Department did promulgate, in 1986, a comprehensive interpretation of what ERISA means by "plan assets." See 51 Fed. Reg. 41278 (1986), 29 CFR § 2510.3–101 (1992). Again, however, the Department did not mention the guaranteed benefit policy exemption contained in § 1101(b) or refer to the status of assets in that setting. See 29 CFR § 2510.3–101 (1992). The Department, without comment, "note[d] that the portion of Interpretive Bulletin 75–2 dealing with contracts or policies of insurance is not affected by the regulation being issued here." 51 Fed. Reg. 41278 (1986). But Interpretive Bulletin

We note, too, that the United States was unable to comply with the Second Circuit's request for its assistance in this very case; the Department of Labor informed the Court of Appeals, after requesting and receiving a substantial extension of time, that "'the need to fully consider all of the implications of these issues within the Department precludes our providing the Court with a brief within a foreseeable time frame.'" 970 F. 2d, at 1141. We recognize the difficulties the Department faced, given the complexity of ERISA and the constant evolution of insurance contract practices as reflected in this case. Our point is simply that, as of 1992, the Department apparently had no firm position it was prepared to communicate.

We need not grapple here with the difficult question of the deference due an agency view first precisely stated in a brief supporting a petitioner. Cf. *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 476 (1992) ("If the Director asked us to defer to his *new* statutory interpretation, this case might present a difficult question regarding whether and under what circumstances deference is due to an interpretation formulated during litigation.") (emphasis in original). It suffices to recall, once again, Congress' words of limitation. The Legislature provided an exemption "to the extent that" a contract provides for guaranteed benefits. By reading the words "to the extent" to mean nothing more than "if," the Department has exceeded the scope of available ambiguity. See *Public Employees Retirement System of Ohio* v. *Betts*, 492 U. S. 158, 171 (1989) ("no deference is due to agency interpretations at odds with the plain language of the statute itself"). We therefore cannot accept current pleas for the deference described in *Skidmore* or *Chevron*.

---

75–2, as we just observed, did not home in on whether, or to what extent, particular insurance contracts fit within the guaranteed benefit policy exemption. Thus the 1986 publication is no more enlightening than the interpretation published in 1975.

The Department of Labor recognizes that ranking free funds as "plan assets" would secure "added legal protections against losses by pension plans, because ERISA imposes restrictions not currently provided by contract and insurance law." Brief for United States as *Amicus Curiae* 25–26. But the Department warns that

> "the disruptions and costs [of holding insurance companies to be fiduciaries under participating group annuity contracts] would be significant, both in terms of the administrative changes the companies would be forced to undertake (*e. g.*, segregation of plan-related assets into segmented or separate accounts, and re-allocation of operating costs to other policyholders) and in terms of the considerable exposure to the ensuing litigation that would be brought by pension plans and others alleging fiduciary breaches." *Id.*, at 25.

These are substantial concerns, but we cannot give them dispositive weight. The insurers' views have been presented to Congress [18] and that body can adjust the statute. See *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting); *Di Santo* v. *Pennsylvania*, 273 U. S. 34, 42 (1927) (Brandeis, J., dissenting). Furthermore, the Department of Labor can provide administrative relief to facilitate insurers' compliance with the law, thereby reducing the disruptions it forecasts.

* * *

For the reasons stated, the judgment of the Court of Appeals for the Second Circuit is

*Affirmed.*

---

[18] See App. to Brief for Petitioner 19–64 (listing the hundreds of individuals and organizations, including insurance industry representatives, testifying before Congress during deliberations on ERISA). Insurance industry representatives have constantly sought amendment of ERISA to exempt all general account assets. See Brief for Certain United States Senators as *Amici Curiae* 13–14.

JUSTICE THOMAS, with whom JUSTICE O'CONNOR and JUSTICE KENNEDY join, dissenting.

Insurance companies hold more than $332 billion in their general accounts pursuant to group annuity contracts with pension plans. See American Council of Life Insurance, 1993 Life Insurance Fact Book Update 27. Today, the Court abruptly overturns the settled expectations of the insurance industry by deeming a substantial portion of those funds "plan assets" and thus subjecting insurers to the fiduciary regime of the Employee Retirement Income Security Act of 1974 (ERISA). Although I agree with the Court that the guaranteed benefit policy exception, § 401(b)(2) of ERISA, 29 U. S. C. § 1101(b)(2), does not—as petitioner Hancock contends—exclude all general account assets from ERISA's coverage, the Court, in making the exception depend upon whether investment risk is allocated to the insurer, *ante*, at 106, proposes a new test that bears little relation to the statute Congress enacted. The relevant question under the statute is not whether the contract shifts investment risk, but whether, and to what extent, it "provides for benefits the amount of which is guaranteed." 29 U. S. C. § 1101(b)(2)(B). In my view, a contract can "provide for" guaranteed benefits before it actually guarantees future payouts—that is, before it shifts the investment risk as to those benefits to the insurer. Accordingly, I respectfully dissent.

## I

The guaranteed benefit policy exception, § 401(b)(2) of ERISA, excludes from the scope of ERISA's fiduciary requirements assets held pursuant to "an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer." 29 U. S. C. § 1101(b)(2)(B). In interpreting this exception, I begin, as in any case of statutory construction, with "the language of the statute," *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 475 (1992), and with the

assumption that Congress "says in a statute what it means and means in a statute what it says there," *Connecticut Nat. Bank* v. *Germain,* 503 U. S. 249, 254 (1992). Unlike the Court, I see no need to base an understanding of § 401(b)(2) on principles derived from the interpretation of dissimilar provisions in the Securities Act of 1933, see *ante,* at 101–104, or from a sense of the policy of ERISA as a whole, see *ante,* at 96. The meaning of the provision can be determined readily by examining its component terms.

First, the insurance contract must "provide for" guaranteed benefits. Because "provides for" is not defined by the statute, we should give the phrase its ordinary or natural meaning. See *Smith* v. *United States,* 508 U. S. 223, 228 (1993). Looking at the contract, the Court observes that there is "no genuine guarantee of the amount of benefits that plan participants will receive in the future." *Ante,* at 105. The Court apparently takes "provides for" to mean that the contract must currently guarantee the amounts to be disbursed in future payments. That is not, however, what "provides for" means in ordinary speech.

When applied to a document such as a contract, "provides for" is "most natural[ly]" read and is "commonly understood" to mean " 'make a provision for.' " *Rake* v. *Wade,* 508 U. S. 464, 473, 474 (1993) (interpreting a section of the Bankruptcy Code that applies to " 'each allowed secured claim *provided for* by the [reorganization] plan' ") (emphasis added). See also Black's Law Dictionary 1224 (6th ed. 1990) (defining "provide" as "[t]o make, procure, or furnish for future use, prepare"). If "provides for" is construed in this way, the insurance contract need not guarantee the benefits for any particular plan participant until the benefits have vested, so long as it makes provision for the payment of guaranteed benefits in the future. See *Mack Boring & Parts* v. *Meeker Sharkey Moffitt, Actuarial Consultants,* 930 F. 2d 267, 273 (CA3 1991) ("Section 401(b)(2)(B) does not, on its face, require that the benefits contracted for be delivered immedi-

ately, and we will not read into the statute such a requirement. Rather, it is enough that the . . . contract 'provided' guaranteed benefits to plan participants at some finite point in the future").[1]

Had Congress intended the meaning the Court suggests, it easily could have applied the exception to an insurance contract "to the extent that benefits, the amount of which is guaranteed by the insurer, are vested in plan participants." The concept of vested benefits was familiar to Congress, see, e. g., 29 U. S. C. § 1001(c), and it knew how to require vesting when it intended to do so. See ERISA § 1012(a), 26 U. S. C. § 411 (1988 ed. and Supp. IV). In the guaranteed benefit policy exception, however, Congress, rather than requiring that benefits be vested, required that guaranteed benefits be provided for.[2]

The second requirement under the statute is that the "amount" of benefits be guaranteed. The relevant "bene-

---

[1] Even Harris Trust, which argues that benefits are not "provided for" until they have vested in plan participants, see Brief for Respondent 15, cannot avoid this common meaning of the phrase. In describing the original contract between Sperry and Hancock, Harris Trust states that "the contract provided for the annual purchase of individual deferred annuities . . . ." Id., at 2 (emphasis added). Certainly, one would not say—and Harris Trust did not mean—that the contract only "provided for" such annuities after they were purchased. Common sense and usage dictate precisely the sense in which Harris Trust used the phrase: The contract made provision for the purchase of annuities. Similarly, after 1968 the contract made provision for the payment of guaranteed benefits.

[2] Giving "provides for" its ordinary meaning as outlined here would not, as the Court suggests, see ante, at 104–105, exempt from ERISA's fiduciary rules any contract "in its entirety" if it allows for the payment of some amount of guaranteed benefits in the future. As the Court implicitly acknowledges, that potential misconstruction of the exception results, not from a misreading of the term "provides for," but from a misunderstanding of the limitation imposed by the phrase "to the extent that." As I discuss below, see infra, at 117–118, I agree with the Court that by limiting the exception to policies "to the extent that" they provide for guaranteed benefits, Congress did not mean that any contract would be completely exempted "if" it provided for any guaranteed benefits. Ante, at 104–105.

fits" under the statute are payments to plan participants, not any payments to the pension plan itself. See *Mack Boring, supra,* at 273 ("[T]he term 'benefit,' when used in ERISA, uniformly refers only to payments due to the plan participants or beneficiaries"). The Court recognizes that the term "benefits" does not include payments to the plan but concludes that the reference to "the amount of" benefits means the *aggregate* amount of benefits. *Ante,* at 106. The Court cites neither authority nor reason for its interpretation, and with good cause. Given that "benefits" refers to payments to individuals, "amount" standing alone most naturally refers to the amount owed to each individual. If, on the other hand, "amount" means aggregate amount, benefits to individuals could vary so long as the insurance company guaranteed that a fixed total amount would be paid. That is hardly consistent with ERISA's focus on protecting plan participants and their beneficiaries. See *ante,* at 96, and n. 5; 29 U. S. C. § 1001(c).

The Court's focus on the aggregate amount of benefits, combined with its understanding of "provides for" as requiring a current guarantee, shifts the inquiry from the nature of the benefits that the policy will provide to individuals to the nature of the return that the policy provides to the plan as a whole. In the Court's view, this is precisely the inquiry demanded by the statute. As it makes clear by its citation to *Peoria Union Stock Yards Co. Retirement Plan* v. *Penn Mutual Life Ins. Co.,* 698 F. 2d 320 (CA7 1983), from which it takes its "lead," *ante,* at 101, the Court sees the guaranteed benefit policy exception as requiring a guaranteed return on all moneys paid to the insurer—that is, the guaranteed benefit policy exception is really an exception for "insurance contract[s] with a fixed payout." *Peoria Union, supra,* at 327.[3] In reaching this result, the Court is driven

---

[3] To be sure, the payouts must be in the form of guaranteed benefits to plan participants, but the Court's focus remains on an overall fixed return. Thus, in its view, any funds not immediately committed to the payment of

by its gloss on the guaranteed benefit exception as a provision demanding an "examination of risk allocation in each component" of the policy. See *ante*, at 102. But Congress nowhere mentioned allocation of risk, fixed payouts, or guaranteed investment returns in the statute, despite the obvious superiority of those terms in conveying the meaning the Court ascribes to the text. Instead, Congress directed our attention to the provision of guaranteed benefits—that is, to the type of payments the policy provides to individual participants.

The Court derives its gloss on the guaranteed benefit policy exception from extratextual sources that lead it to a reading divorced from the statute's language. First, the Court begins its analysis not with an examination of the terms of § 401(b)(2), but with a discussion of cases decided under the Securities Act of 1933, 48 Stat. 74, as amended. For example, the Court looks to a case in which we addressed whether a variable annuity was an "investment contract" covered by § 2 of the Securities Act, 15 U. S. C. § 77b, or an "insurance or endowment policy or annuity contract or optional annuity contract" exempted by § 3 of that Act, 15 U. S. C. § 77c(a)(8). See *SEC* v. *United Benefit Life Ins. Co.*, 387 U. S. 202, 204–205, 211 (1967). Were it disputed that GAC 50 is an "insurance policy or contract," it might be useful to consider how this Court has defined an insurance policy under federal securities law and the extent to which GAC 50 meets that test. Here, however, no one denies that GAC 50 is an insurance policy. If it were not, § 401(b)(2) would not apply at all. Because GAC 50 is concededly an insurance policy, its allocation of risk is irrelevant to the distinct inquiry demanded by the statute into the provision of guaranteed benefits.

---

guaranteed benefits (through the purchase, for example, of fixed annuities) must be invested at a guaranteed return and converted to guaranteed benefits at a rate fixed by contract. *Ante*, at 106.

The second source from which the Court distills its "risk of loss" test is the premise, based on ERISA "as a whole," that "Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *Ante*, at 96. Even were that true, there is no need to resort to such general understandings of the policy behind a statute when the language suggests a contrary meaning. Cf. *Connecticut Nat. Bank*, 503 U. S., at 253–254; *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*, 469 U. S. 189, 194 (1985) (statutory construction begins with "the assumption that the ordinary meaning of [the] language accurately expresses the legislative purpose"). The text of § 401(b)(2) gives no reason to think that Congress meant to protect pension plans from all risk or to impose a fiduciary duty on the insurer whenever the pension plan faced a possibility of loss. Congress easily could have required that all funds credited to a pension plan be guaranteed, but it did not.

Moreover, contrary to the Court's assumption, in the statute "as a whole" Congress did not impose fiduciary duties on all persons whose actions affect the amount of benefits plan participants receive. In the same section that contains the guaranteed benefit policy exception, for example, Congress exempted pension plans' investments in mutual funds from ERISA's fiduciary provisions. See 29 U. S. C. § 1101(b)(1); H. R. Conf. Rep. No. 93–1280, p. 296 (1974). Obviously, pension plans bear a significant risk with respect to such investments, yet Congress allowed them to bear that risk without imposing fiduciary duties on the companies that manage the funds.

In any event, as long as a policy provides for guaranteed benefits as I have described them, the connection between the return to the plan and the amount of benefits individual plan participants receive is remote. The insurer's investment performance would influence the amount of benefits if participants received either variable benefits or fixed benefit

payments that were not guaranteed, *e. g.*, benefits paid for a fixed amount of time unless the fund from which they were paid was depleted sooner. In both cases, ERISA imposes fiduciary duties on the insurer. But as long as the benefits will be guaranteed, a variable return to the plan entails no such risk for plan participants. Whether the insurer earns 2% or 20%, or even loses 20% on its investments, participants will receive the same amount of benefits.[4]

In short, the provision of guaranteed benefits does not require the provision of a guaranteed return to the plan, nor does it require that all amounts to be provided in the future be currently guaranteed. In my view, an insurance policy "provides for benefits the amount of which are guaranteed" when its terms make provision for fixed payments to plan participants and their beneficiaries that will be guaranteed by the insurer. The policy need not guarantee the aggregate amount of benefits that will ultimately be returned from the plan's contributions or insulate the plan from all investment risk to accomplish that more limited goal.

Of course, as the Court correctly observes, § 401(b)(2) excludes an insurance company's assets from fiduciary obligations only "to the extent that" the policy provides for guar-

---

[4] In this case, Sperry's retirement plan, not the insurance policy, specifies the amount of benefits to which a plan participant is entitled. App. 119, 121. The return on the funds held under GAC 50 has no effect on that amount. Thus, even if the free funds fell to zero and the policy terminated, see *ante*, at 105–106, plan participants whose benefits had not yet vested would be entitled to the same amount of benefits under the plan itself, and would have an action against the plan if it failed to pay. See 29 U. S. C. § 1132(a). For this reason, it is simply wrong to suggest, as some *amici curiae* do, that reversing the decision below would leave millions of pensioners unprotected by ERISA. See Brief for Senator Howard Metzenbaum et al. as *Amici Curiae* 15. If the plan, on the other hand, is "trapped" by an unwise insurance contract, the trap is one of its own making. Those *amici* are in a far better position than this Court to persuade Congress to protect pension plans from their own mistakes and misjudgments. Nothing in either the text or the logic of the guaranteed benefit policy exception provides such protection.

anteed benefits. That limitation does not mean that the exception is available to a contract "if" it provides for guaranteed benefits. Cf. *ante,* at 104–105. Rather, the term suggests that a contract may provide for guaranteed benefits only to a certain extent. In the Court's view, to the extent that a policy allows a pension plan a variable return on free funds not yet committed to providing guaranteed benefits to participants, it falls outside the §401(b)(2) exception. Once again, however, the Court's understanding of the statute is controlled by its focus on the allocation of risk. The difficulty the Court sees with the variable return on any component of the contract is that a variable return ensures no guaranteed aggregate amount of benefits. If all of the funds attributable to the policy are allocated to purchasing guaranteed benefits, however, whether those funds come from pension plan contributions or investment return, the contract is "provid[ing] for benefits the amount of which is guaranteed" in its entirety. Only if one assumes, as the Court does, that overall returns are critical would one read the "to the extent that" limitation more narrowly.

## II

In its effort to insulate Harris Trust from all risk, the Court radically alters the law applicable to insurance companies. The Department of Labor has taken the view that general account assets are not plan assets. See, *e. g.,* Interpretive Bulletin 75–2, 40 Fed. Reg. 31598 (1975), 29 CFR §2509.75–2 (1992) (concerning prohibited transactions); §2510.3–101 (same).[5] In reliance on that settled under-

---

[5] I agree with the Court that Interpretive Bulletin 75–2's exemption of all general account assets from fiduciary requirements is at odds with the text of § 401(b)(2) and is therefore not entitled to deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984). Rejecting the Department of Labor's interpretation of the guaranteed benefit policy exception, however, does not require adopting the Court's extreme approach.

standing, insurers have set up general account contracts with pension plans and have managed assets theoretically attributable to those policies, not in accordance with ERISA's fiduciary obligations, but in accordance with potentially incompatible state-law rules. See *Mack Boring*, 930 F. 2d, at 275, n. 17. Most States treat the relationship between insurer and insured as a matter of contract, not a fiduciary relationship. See, *e. g., Benefit Trust Life Ins. Co.* v. *Union Nat. Bank of Pittsburgh*, 776 F. 2d 1174, 1177 (CA3 1985) (generally, relationship between insurer and insured is "solely a matter of contract"); *New Hampshire Ins. Co.* v. *Foxfire, Inc.*, 820 F. Supp. 489, 497 (ND Cal. 1993) (implied covenant of good faith and fair dealing does not create fiduciary relationship between insurer and insured under California law). And state law generally requires that the insurer not discriminate among its policyholders. See, *e. g.*, N. Y. Ins. Law § 4224(a)(1) (McKinney 1985). ERISA, on the other hand, will require insurers to manage what the Court deems plan assets "solely in the interest of the participants and beneficiaries" of the plan, 29 U. S. C. § 1104(a)(1), and will impose a host of other requirements. These conflicting demands will place insurers in a difficult position: "Whenever an insurance company takes actions to ensure that under state law, it is treating its policyholders fairly and equitably, it runs the risk of violating ERISA's fiduciary requirements." *Mack Boring, supra*, at 275, n. 17.

Although the Court attempts to limit the fiduciary duty to the free funds—it dubs only the free funds "'plan assets,'" see *ante*, at 106—the duty it imposes on insurers extends much farther. The free funds are not identifiable assets at all, but are simply an accounting entry in Hancock's books. The amount of the free funds, and hence their "management," *ibid.*, depends on the management of all of the assets in Hancock's Group Pension line of business. See Agreed Statement of Facts ¶ 43, App. 91. To impose fiduciary duties with respect to the management of the free funds is essen-

tially to impose fiduciary duties on the management of the entire line of business. Although insurers in reaction to today's decision may be able to segregate their assets and allocate certain assets to free funds on specific contracts, that will not help insurers like Hancock in this case who now find themselves potentially liable for past actions.[6]

The Court's decision may also significantly disrupt insurers' transactions with companies whose pension plans they fund. The Court's interpretation of § 401(b)(2) will impose on insurers not only general fiduciary duties under 29 U. S. C. § 1104, but also restrictions on prohibited transactions under § 1106. The guaranteed benefit policy exception expressly applies to both. See § 1101(b) (applying subsections (b)(1) and (b)(2) "[f]or purposes of this part," that is, Part 4, which comprises §§ 1101–1114). Indeed, this case concerns alleged violations of both sections. Amended Complaint ¶ 40, App. 58. Among the previously innocent transactions now potentially prohibited will be an insurer's investment in stock issued by any of the employers whose pension plans the insurer funds, a lease of a building owned by the insurer to one of those employers, or the purchase of goods or services from any of those employers. See Hearings on Public Law 93–406 before the Subcommittee on Labor Standards of the House Committee on Education and Labor, 94th Cong., 1st Sess., 390–391 (1975) (testimony of the Assistant Secretary of Labor). Thus, large insurance companies that may have sold policies to thousands of pension plans could suddenly find themselves restricted in contracting with the corre-

---

[6] It will be especially difficult for the lower courts in this case to limit application of fiduciary duties to the free funds, as the Court appears to desire, because the pension plan claims that Hancock breached its fiduciary duty by understating the amount of the free funds. See Amended Complaint ¶¶ 29, 30, 40, App. 55–56, 58–60. Thus, it will not be possible to determine the extent of Hancock's fiduciary duty without first ascertaining whether Hancock violated it.

sponding thousands of employers whose goods and services they may require. See *id.*, at 391.

I do not intend to suggest that the Court should give dispositive weight to the practical effects of its decision on the settled expectations of the insurance industry (and its customers, the pension plans, who stand to lose much of the benefit that these contracts presumably offered them). Such considerations are a matter for Congress. But surely the serious and far-reaching effects that today's ruling is likely to have should counsel caution and compel the Court to undertake a closer examination of the terms of the statute to ensure that Congress commanded the result the Court reaches. As discussed in Part I, *supra*, I believe Congress did not mandate that result.

## III

Application of the standards I have outlined above to GAC 50, prior to its amendment in 1977 to allow for payment of nonguaranteed benefits, is relatively straightforward. In its pre-1977 form, GAC 50 provided for guaranteed benefits in its entirety. Plan participants would be guaranteed to receive the amount of benefits specified in the contract if the contract was in operation when they retired, regardless of the contract's subsequent termination, App. 137, or any other contingency. Hancock's entire general account, not simply the funds Hancock credited to the pension plan, stood behind that guarantee. Moreover, GAC 50 provided that all investment return remained in a fund allocated exclusively to the payment of guaranteed benefits, and all of the free funds were available to pay such benefits. We therefore are not faced with a contract that uses a pretextual option of guaranteed benefits to disguise an ordinary investment vehicle. Apart from an asset withdrawal mechanism that imposed a significant charge, the contract provided for no other way to

use those funds. See 767 F. Supp. 1269, 1274–1275 (SDNY 1991).[7]

Indeed, that is precisely why this litigation arose. Hancock had not squandered the pension plan's funds, as one might expect in the run-of-the-mill breach of fiduciary duty case. The Pension Administration Fund, and thus the free funds, had grown beyond the parties' expectations. The pension plan, however, was unhappy with the bargain it had struck in its contract. By 1977, it had discovered that it could get cheaper guaranteed benefits and a better return on its investment elsewhere, see *id.*, at 1273–1274, but GAC 50 posed several obstacles to moving the uncommitted funds. Terminating the contract would require the plan to "repurchase" annuities for the benefits already guaranteed. The repurchase price set by the contract depends on assumptions concerning the interest rate that would be earned on the funds over the term of the annuity. See Agreed Statement of Facts ¶¶ 33–34, 41, App. 89, 90–91 (2½–3% for benefits vested before 1968; 5% for those vested after 1968).[8] Because those interest rates turned out by the late 1970's to be relatively low compared to prevailing market rates, the contractually determined price for purchasing the annuities was correspondingly high and the pension plan considered the option of terminating the contract to be "prohibitively expensive." Brief for Respondent 5. Withdrawing assets, as already mentioned, entailed a significant asset liquidation adjustment. Therefore, before the 1977 amendment the only other way the free funds could be used was to purchase

---

[7] GAC 50 made no provision for the rollover mechanism that Hancock allowed the pension plan to use on several occasions to reduce the surplus in the Pension Administration Fund. See 767 F. Supp., at 1274–1275. See also Agreed Statement of Facts ¶ 77, App. 96.

[8] The "artificially low interest rate assumptions," *ante*, at 93, in the contract were last amended in 1968. See Agreed Statement of Facts ¶¶ 105, 111, App. 100, 101. The pension plan alleged that Hancock breached its fiduciary duties by refusing to amend the contract again to take into account changed conditions. Amended Complaint ¶ 40(b), App. 58.

guaranteed benefits for plan participants. It is difficult to see how a policy that provided for nothing but guaranteed benefits could be said not to provide for such benefits in its entirety.

The extent to which GAC 50 "provides for" guaranteed benefits is more complicated, however, because the 1977 amendment discontinued the automatic provision of guaranteed benefits and permitted the payment of "Non-Guaranteed Benefits." See Agreed Statement of Facts ¶¶ 80, 82, App. 96–97. Proper resolution of this case ultimately depends on the operation and the effect of that amendment. Because the courts below did not discuss its relevance and should be given the opportunity to consider it in the first instance, I would remand.

## IV

In the judgment of both the Court and the Second Circuit, to the extent that the contract "'provides no guarantee of benefit payments or fixed rates of return, it seems to us that [Hancock] should be subject to fiduciary responsibility.'" *Ante*, at 104 (quoting 970 F. 2d 1138, 1144 (CA2 1992)). Perhaps it should. But imposing that responsibility disrupts nearly 20 years of settled expectations among the buyers and sellers of group annuity contracts. I do not believe that the statute can be fairly read to command that result. I therefore respectfully dissent.